STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
ANTHONY FRANK ORDOG, Jr., DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
GARY RUSH, DEFENDANT-APPELLANT.

Argued April 12, 13, 1965—Decided July 12, 1965.

348

350

*Mr. Norman Heine,* Camden County Prosecutor, argued the causes for State of New Jersey, plaintiff-respondent, *Mr. Arthur Batoff,* Assistant Prosecutor, on the brief in *State v. Ordog.*

*Mr. I. V. DiMartino* argued the cause for Anthony Frank Ordog, Jr., defendant-appellant.

*Mr. Ralph J. Kmiec* argued the cause for Gary Rush, defendant-appellant.

The opinion of the court was delivered by

HANEMAN, J. Anthony Ordog (Anthony), Gary Rush (Gary) and Russell Rush (Russell) were indicted for the murder of Mary Tilton. Originally all three pleaded not guilty. The pleas were subsequently changed to *non vult.* Anthony and Gary later retracted their pleas and entered pleas of not guilty. These two defendants were tried jointly on the theory of felony-murder, but the State did not seek the death penalty. The jury found them guilty and recommended life imprisonment as to both. Separate appeals were taken by the defendants to this Court as of right. *R. R.* 1:2–1(c).

The facts adduced at trial indicate that shortly after 11:00 P.M. on January 18, 1962 two men entered the Farm Tavern in Winslow Township, Camden County. One carried a shotgun and the other a claw hammer. Each had his face covered

with a handkerchief. The one with the shotgun announced that it was a "stick up" and took the wallets of Edward Cahill, one of the proprietors, and Frank Scardino, a customer. The one with the claw hammer went behind the bar and emptied the cash register. Mary Tilton, co-owner of the tavern, was behind the bar throughout this time. The robber with the shotgun demanded money from her. When she denied having any, he shot her from a distance of four feet. The two men then left. Mary Tilton died as a result of the wounds thus inflicted.

The State contends that Russell was the man with the shotgun, his brother Gary the man with the claw hammer, and that Anthony (the driver of the get-away car) was waiting outside during the perpetration of the robbery and murder. Its principal proofs included the confession of Anthony, dated December 21, 1962, and the confession of Gary, dated December 26, 1962. Russell also confessed, and testified at the joint trial of Anthony and Gary as to his participation in the crime. However, while he refused to implicate either Anthony or Gary, his testimony strongly tended to corroborate the confessions of the other two. Additionally, the State produced the wallets of Cahill and Scardino, found by State Highway Department employees on the White Horse Pike some five to six miles from the tavern. The State also introduced as the murder weapon a shotgun owned by Philip Appenzeller, the owner of a restaurant in Riverside, by whom Russell was employed during the month of January 1962. Appenzeller identified a 12-gauge plastic shotgun shell which he found in the back room of the restaurant where the gun was kept. He testified that he had never purchased or owned such a shell. A State Police official produced a plastic wad from a shotgun shell found at the scene of the murder, which was later identified as a component part of the type of shell found by Appenzeller. August Stecher, the owner of a sporting goods store in Riverside, testified that Anthony and Russell had discussed this type of shell with him in December of 1961, but that he could not remember selling them any ammunition.

## A.

We shall first treat of Anthony's appeal, which is also dispositive of many of the issues raised by his codefendant Gary. He argues that the trial court erred in:

(1) Not granting a severance;

(2) Finding that his confession was voluntarily given;

(3) Admitting his confession, since the evidence clearly disclosed that he was not represented by counsel, was not informed of his right to counsel and was not admonished of his other constitutional rights;

(4) Admitting the confession into evidence in view of the fact that he had not received a preliminary hearing prior to the taking thereof;

(5) The refusal to enter a judgment of acquittal at the conclusion of the State's case and at the conclusion of the entire case because of insufficient corroboration of his confession;

(6) Permitting Dr. Spradley, a psychiatrist, to testify to what Gary told him about Anthony's participation in other crimes.

He also argues that the prosecutor transcended the legal bounds of a summation in that he urged that the jury should convict these defendants as a deterrent to other prospective criminals.

We will discuss Anthony's arguments in the order above listed.

## I.

Anthony twice moved for a severance under *R. R.* 3:5–7. He claims on this appeal that the trial court abused its discretion in not granting such a severance because of the alleged prejudicial effect of inculpating statements made by Gary in his confession, which was admitted into evidence, and the repetition by Dr. Spradley while he was a witness on rebuttal of statements made to him by Gary indicating that Anthony had participated with him in the commission of other crimes.

■ It is indisputable that while the admission of one defendant's confession in a joint trial has the potentiality of prejudice to other defendants implicated by the confession, such statements are, in some circumstances, admissible. See generally *State v. Blanchard*, 44 *N. J.* 195 (1965). As we stated in *State v. Tassiello*, 39 *N. J.* 282, 296 (1963):

"* * * it is generally recognized that considerations arising out of the due administration of criminal justice frequently require that several defendants be tried jointly and that the confession of one defendant be admitted into evidence at such a joint trial where the circumstances are such that the jury can reasonably be expected to follow the court's admonition to disregard the confession as to the other defendants."

Thus, where a joint trial is held and the out-of-court confession of one defendant inculpates the other, the trial court must clearly, promptly and emphatically caution the jury on the limited effect to be given to the confession. *State v. Murray*, 33 *N. J.* 393, 398 (1960); *State v. Johnson*, 31 *N. J.* 489, 506 (1960). But even then there may be situations where limiting instructions would be ineffective. *State v. Blanchard, supra*, 44 *N. J.*, at *pp.* 199, 203. See *Delli Paoli v. United States*, 352 *U. S.* 232, 243, 77 *S. Ct.* 294, 300, 1 *L. Ed. 2d* 278, 286 (1957). The trial court in the instant case adequately cautioned the jurors when the confessions were admitted into evidence, and in his charge he again emphasized the limited effect to be given extrajudicial statements made by one defendant.

■ The issue on this appeal, therefore, is whether in the circumstances of this case the jury could reasonably have been expected to follow the trial court's admonitions. There were here only two defendants and two confessions. This made it reasonably easy for the jury to remember, in light of the court's direction, the limited effect to be given to Gary's confession. See *State v. Murray, supra*. Compare *State v. Blanchard, supra,* where six confessions were involved and we concluded that it was virtually impossible for the jury to remember what evidence was admissible against which de-

fendant. Additionally, the confessions of Anthony and Gary were substantially the same. Since Gary's confession was to all intents cumulative of Anthony's, the identical information was before the jury in each confession, and it was unlikely that the jury would have any occasion to go beyond Anthony's own confession and use similar statements in Gary's confession against him. See *United States ex rel. Johnson v. Yeager,* 327 *F.* 2d 311, 318–319 (3 *Cir.* 1963), *cert.* denied 377 *U. S.* 977, 84 *S. Ct.* 1882, 12 *L. Ed.* 2d 745 (1964), 377 *U. S.* 984, 84 *S. Ct.* 1882, 12 *L. Ed.* 2d 753 (1964); *cf. State v. Johnson, supra,* 31 *N. J.,* at *p.* 506; *Delli Paoli v. United States, supra,* 352 *U. S.,* at *p.* 242, 77 *S. Ct.,* at *p.* 300, 1 *L. Ed.* 2d, at *p.* 286. It is on this ground that *State v. Young,* 86 *N. J. Super.* 262, 264–265 (*App. Div.* 1965), certif. granted 44 *N. J.* 397 (1965), is distinguishable. In that case only the codefendant confessed, and the court found it improbable that the jury could disregard the many references to Young in that confession. Under the facts present in this case we cannot say that the trial court abused its discretion in denying the motion for a severance.

Doctor Spradley, the State's psychiatrist, testified on rebuttal that during his psychiatric examination of Gary the latter told him of Anthony's participation with him in a number of other crimes. He further emphasized that the consideration of this part of Gary's history was absolutely necessary for the formation of a valid expert opinion as to Gary's sanity, especially insofar as it related to the extent of his recovery from the memory impairment resulting from shock therapy he had recently undergone. *Cf. State v. Whitlow,* 45 *N. J.* 3 (1965). The trial court admitted this rebuttal testimony but again gave clear, immediate and emphatic precautionary instructions to the jury that these statements could not be used against Anthony on the question of his guilt or innocence, that they were not offered for their truth but merely as a foundation for the doctor's opinion, and that the jury's consideration thereof must be limited to their role as psychiatric background information justifying the doctor's

opinion. The instructions were repeated in the court's charge. In *State v. Lucas,* 30 *N. J.* 37 (1959), this Court said, at *pp.* 79–80:

"It should be noted that there may be instances in which statements made by the accused to the psychiatrist might also relate to the guilt or innocence of the accused. \* \* \* In such instances the introduction of the testimony is permissible where the psychiatrist asserts that it constituted a necessary element in the formulation of his opinion. In that event, the testimony should be circumscribed by an appropriate limiting charge by the trial court to the effect that it should not be considered by the jury as substantive evidence relating to the question of guilt or innocence of the accused, but only as evidence tending to support the ultimate expert conclusion of the psychiatrist on the question of insanity. If it further appears that the psychiatrist's opinion hinges upon the truth of the matter asserted, rather than the fact that it was said, then the jury should be instructed that the probative value of the psychiatrist's opinion will depend upon whether there is, from all the evidence in the case, independent proof of the statement made by the accused."

The same rule is logically applicable to a statement implicating a codefendant. In light of the above we perceive no error in refusing to grant a severance on this ground.

## II.

In November 1962, the State Police received a tip that Anthony had been involved in the Farm Tavern robbery-murder. They attempted to see him in the State Prison on December 14, 1962, where he was incarcerated for another crime, but were refused permission because he was under doctor's care for a recent hernia operation. However, on December 21, 1962 three State Police officers were permitted to interview Anthony in the parole board room of the State Prison.

The State's testimony, initially taken outside of the presence of the jury, which bears on this interview, and thereby on the voluntariness of Anthony's confession, proceeded as follows: Anthony (then 19 years of age) came into the room at 9:25 A. M. Two of the detectives, dressed in civilian clothes, were then present. They identified themselves as police offi-

cers and advised him that they were there to question him about some armed robberies. Before 10:30 A. M. Anthony had confessed to several other robberies. The police then proceeded to question him about the Farm Tavern crime. At 11:00 A. M. they took a 15 minute break to permit Anthony to go to the lavatory, and have a soda. By approximately 11:45 A. M. he had orally confessed to his part in the robbery-murder. The third detective then entered the room to witness Anthony's formal statement, the typing of which began at noon. The introduction of the statement, which was read to Anthony, contains a warning that it was to be free and voluntary and that it could be used against him. He acknowledged that he understood that admonition and was willing to make the statement. The recordation of the statement continued from noon until 12:30 P. M. when lunch was brought in for all occupants of the room, including Anthony. Between 12:30 and 1:00 P. M. he was asked no questions. At 1:00 P. M. the recordation of the statement was resumed, and was completed by 2:15 P. M. Anthony read the statement and acknowledged its correctness, but refused to sign it. After the police indicated that they did not believe Anthony's contention that he was not inside the tavern during the crime, he requested that his confession be substantiated by a lie detector test. Such a test was administered by one of the three officers. The police further testified that no threats or promises were made and that no physical force was used; that Anthony made no complaints about physical discomfort as a result of his recent operation or otherwise, nor did he show any signs of exhaustion or nervousness; and that he was permitted to walk about the room on several occasions.

█ Anthony does not allege that the confession was the result of physical police brutality, but rather that the confession was "induced by coercive actions or tactics short of physical violence"—that "it was extracted by more sophisticated methods." In short, he argues that the confession was coerced by psychological pressure. In support of this position the defense introduced expert medical testimony to cast doubt

upon the voluntariness of the confession. The proofs, viewed in a light most favorable to him, indicate that he is retarded (but not mentally deficient), his judgment is very poor, and he is very suggestive and easily led. Thus, Dr. Tornay, a specialist in neurology and psychiatry, who was called by Anthony, testified that Anthony possessed the intelligence of a seven-year-old and the judgment of a six-year-old. On rebuttal, Dr. Spradley testified that Anthony "was not a mental defective," and that he functioned mentally "within limits of what we call average" for a boy 19 years of age. The defendant also took the stand and testified that the police did not introduce themselves as police officers, and he believed they were present for the purpose of administering medical tests. He was given a test on a machine which he believed to be a medical device but which he later learned was a polygraph. Only after the test was administered did he learn the identity of the men. He was questioned incessantly from 9:00 A.M. to 5:00 P.M. by all three officers; he had pain all day from the aftereffects of his recent hernia operation, which made him feel faint, shake, and cry; and that except for one trip to the lavatory he was not permitted to arise from the chair in which he was sitting but was pushed back into it when he attempted to stand. The foregoing, says Anthony, operating upon his low mentality, made the alleged confession involuntary.

The defendant's treating physician, however, testified that while Anthony would have times of discomfort as a result of the recent hernia operation, mental strain would not have any effect on the wound, nor would sitting in a chair for a prolonged period of time. And on rebuttal the three policemen explicitly refuted each of defendant's contentions. The State then moved that the confession be admitted as voluntary. The trial judge, in a lengthy review of the testimony, including his observation of the defendant and his conduct on the witness stand, found that while his mental processes were slow, he had a mental capacity to knowingly and voluntarily confess. In a well reasoned conclusion he found the confession to be voluntary, emphasizing that there was no physical abuse,

the defendant was not in pain from the operation, and that the interrogation was during reasonable hours and for reasonable periods of time. We agree that on the facts as adduced it was proper to submit the factual issue of voluntariness to the jury.

 Subnormal mentality does not *ipso facto* make a confession involuntary,

"* * * so long as the subnormality has not deprived the person in question of the capacity to understand the meaning and effect of the confession. But mental subnormality is a factor to be considered in determining the issues of voluntariness and admissibility, and, where accompanied by other factors indicative of an absence of voluntariness, will require that the confession "be excluded." Annot., 69 A. L. R. 2d 348, 350 (1960)

See *Fikes v. Alabama*, 352 U. S. 191, 77 S. Ct. 281, 1 L. Ed. 2d 246 (1957); *State v. Daley*, 45 N. J. 68 (1965).

 The defendant relies on such cases as *Haley v. Ohio*, 332 U. S. 596, 68 S. Ct. 302, 92 L. Ed. 224 (1948), and *Spano v. New York*, 360 U. S. 315, 79 S. Ct. 1202, 3 L. Ed. 2d 1265 (1959), which are clearly distinguishable on their facts. In *Haley* the suspect was a 15-year-old boy whose immaturity made him more susceptible than an adult to the pressures of persistent interrogation by law enforcement officers. The police began questioning young Haley in relays at midnight and continued until they obtained the desired confession at 5:00 A. M. The inevitable coercive effect of that much interrogation at that time of night upon a 15-year-old boy was held to be sufficient to make his confession involuntary. And in *Spano* a 25-year-old man with a history of emotional instability was questioned from 7:15 P. M. until he confessed at 3:25 A. M. In finding that the confession drawn from this man after an eight hour grilling was not voluntary, the Court emphasized the inevitable effect of fatigue as interrogation continued through the late hours of the night, and that a policeman friend of his falsely played upon his sympathies. See also *Gallegos v. State of Colorado*, 370 U. S. 49, 82 S. Ct. 1209, 8 L. Ed. 2d 325 (1962). In that case the defendant, a

14-year-old youth, formally confessed after having been held incommunicado for five days. The Court set aside his conviction on due process grounds, finding that the confession had been obtained by "secret inquisitorial processes" and other forms of compulsion. The Court said:

"There is no guide to the decision of cases such as this, except the totality of circumstances that bear on the two factors we have mentioned. The youth of the petitioner, the long detention, the failure to send for his parents, the failure immediately to bring him before the judge of the Juvenile Court, the failure to see to it that he had the advice of a lawyer or a friend—all these combine to make us conclude that the formal confession on which this conviction may have rested (see *Payne v. Arkansas*, 356 *U. S.* 560, 568, 78 *S. Ct.* 844, 850, 2 *L. Ed. 2d* 975) was obtained in violation of due process." 82 *S. Ct.*, at *p.* 1213

In so doing it emphasized the youth of the defendant (see *Haley v. Ohio, supra*). But we do not interpret any of those decisions as saying that confessions made by those of "juvenile intelligence" are *per se* involuntary. The fact that a prisoner is unstable or otherwise susceptible to overreaching is not in and of itself sufficient to render a confession involuntary, *United States ex rel. Johnson v. Yeager, supra*, 327 *F. 2d*, at *p.* 318, but is just one of many factors to be considered in determining voluntariness. *Culombe v. Connecticut*, 367 *U. S.* 568, 81 *S. Ct.* 1860, 6 *L. Ed. 2d* 1037 (1961).

Considering the totality of the circumstances here involved we conclude that the finding of voluntariness was warranted.

## III.

Anthony also argues that his confession was inadmissible regardless of its voluntariness, relying on *Escobedo v. Illinois*, 378 *U. S.* 478, 84 *S. Ct.* 1758, 12 *L. Ed. 2d* 977 (1964).

When defendant first confessed orally he was not warned of any of his rights. Before the written statement was taken he was warned that it must be voluntary and could be used against him. He at no time requested counsel. *Escobedo* is not applicable. See *State v. Lanzo*, 44 *N. J.* 560 (1965); *State v. Bindhammer*, 44 *N. J.* 372, 384 (1965); *State v.*

*Hodgson,* 44 *N. J.* 151, 162–163 (1965) ; *State v. Vigliano,* 43 *N. J.* 44, 49–52 (1964) ; *State v. Smith,* 43 *N. J.* 67, 83–84 (1964), *cert.* denied 379 *U. S.* 1005, 85 *S. Ct.* 731, 13 *L. Ed. 2d* 706 (1965).

That he neither consulted with a lawyer nor was advised of his right to remain silent are, under these facts, nothing more than factors relevant to the issue of voluntariness of the confession. They are not in and of themselves determinative. *State v. Grillo,* 11 *N. J.* 173, 180–181 (1952), *cert.* denied 345 *U. S.* 976, 73 *S. Ct.* 1123, 97 *L. Ed.* 1391 (1953) ; *State v. Pierce,* 4 *N. J.* 252, 262 (1950). *Cf. State v. Reynolds,* 41 *N. J.* 163, 180 (1963), *cert.* denied 377 *U. S.* 1000, 84 *S. Ct.* 1934, 12 *L. Ed. 2d* 1050 (1964).

Since oral argument counsel has raised *United States ex rel. Russo v. State of New Jersey,* —— *F. 2d* —— (3 *Cir.* 1965). We have considered that opinion but we adhere to our original interpretations as to the scope and applicability of *Escobedo.* See *State v. Lanzo, supra; State v. Bindhammer, supra; State v. Hodgson, supra; State v. Vigliano, supra; State v. Smith, supra.*

### IV.

 Defendant requests that we reconsider our holding in *State v. Jackson,* 43 *N. J.* 148, 167–168 (1964), that delay in bringing a defendant before a local magistrate for a preliminary examination does not dictate exclusion of evidence obtained while he was in custody, in favor of the rule enunciated in *McNabb v. United States,* 318 *U. S.* 332, 63 *S. Ct.* 608, 87 *L. Ed.* 819 (1953), and *Mallory v. United States,* 354 *U. S.* 449, 77 *S. Ct.* 1356, 1 *L. Ed. 2d* 1479 (1957). We see no reason to depart from our recent decisions on this point. See *State v. Hodgson, supra,* 44 *N. J.,* at *pp.* 157–158; *State v. Johnson,* 43 *N. J.* 572, at *pp.* 592–593.

 Additionally, it is to be noted that Anthony not only did not receive a preliminary hearing before he confessed, but that he received no preliminary hearing, being at the time of his confession and up to the date of his indictment incar-

cerated in Trenton State Prison on another charge. We have recently held that failure to provide a defendant with a preliminary hearing is not in and of itself a sufficient basis upon which to set aside a conviction. *State v. Smith,* 32 *N. J.* 501, 536 (1960), *cert.* denied 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed. 2d* 367 (1961). See also *State v. Kirkland,* 82 *N. J. Super.* 409, 413–414 (*App. Div.* 1964); *State v. Jackson, supra,* 43 *N. J.,* at *p.* 165.

## V.

Anthony argues that in any event his confession was not sufficiently corroborated, and that for this reason his motions for acquittal should have been granted. In *State v. Lucas, supra,* 30 *N. J.,* at *p.* 56, this Court said, on the question of corroboration:

"* * * the test * * * that the State must introduce independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury, affords ample protection for the accused and is the rule best designed to serve the ends of justice in the administration of the criminal law."

And at *p.* 58:

"* * * No greater burden should be required of the State than *independent corroborative proof tending to establish that when the defendant confessed he was telling the truth,* plus independent proof of the loss or injury." (Emphasis added)

See also, however, *State v. Johnson, supra,* 31 *N. J.,* at *p.* 504, where we stated:

"* * * It is also clear that admissions and confessions made by each defendant may not be used to corroborate the admissions and confessions of the others. Each defendant may bind only himself by his own words."

Accord, *Wong Sun v. United States,* 371 *U. S.* 471, 490–491, 83 *S. Ct.* 407, 418–419, 9 *L. Ed. 2d* 441, 455–457 (1963).

▮ In the matter *sub judice* there is no dispute that death occurred (the "loss or injury" referred to in *State v. Lucas, supra*). The issue, therefore, is whether the State

introduced independent evidence to indicate that Anthony was telling the truth when he confessed. Although Russell refused to implicate Anthony or Gary and refused to name the other two participants with him in the crime, his testimony as to the facts leading up to and succeeding the robbery corroborate, as to essential facts, the factual recitation found in Anthony's confession. Thus, Russell described the details of the crime in the same manner as Anthony did in his confession, including the number of participants, the color and kind of car used, the basis for the decision to rob the Farm Tavern, the weapons carried, the fact that one man remained in the car, the fact that two wallets were obtained in the robbery and the locale where they were discarded after the division of the money. Other witnesses testified to the finding of the wallets in a place fitting the description given by Anthony, and the victims of the robbery corroborated many of the details contained in Anthony's statement concerning the actual perpetration of the crime. All of these facts could be known only to a participant, and there is absent any explanation of how Anthony would know these corroborative facts except by his own observation as a participant in the criminal act.

In *Lucas, supra*, 30 *N. J.*, at *p*. 62, we said that:

"On motion to direct an acquittal on grounds of lack of corroboration the trial court must determine whether there is any legal evidence, apart from the confession of facts and circumstances, from which the jury might draw an inference that the confession is trustworthy. * * *"

We think that test was clearly met and the trial judge properly denied the motions for acquittal. While the judge did not specifically charge the jury on their duty to find corroboration, in light of his charge that the weight and credibility to be given to the confession were for the jury in the light of all the evidence, this cannot be assigned as plain error. *R. R.* 1:5–1(a). See *State v. Lucas, supra*, 30 *N. J.*, at *pp*. 62–63.

### VI.

Anthony further argues that permitting Dr. Spradley, the State's psychiatrist, to testify on rebuttal as to what Gary

told him about Anthony's participation in other crimes constitutes reversible error.

Dr. Rushton, who was called by Gary, testified that he had examined him on March 27, 1964. Based almost exclusively upon the history which he received at that psychiatric interview, he came to the conclusion that Gary's memory was "vague and impaired in some areas" and that "this memory impairment was probably due to the electro-shock treatments he had received in 1962," but that his memory would improve with the passage of time after those treatments. Dr. Rushton's recital of the specific facts conveyed by Gary to him was rather sparse. The State called Dr. Spradley on rebuttal to negate the expert testimony of the defense regarding these alleged memory defects. Dr. Spradley testified as to the autobiographical facts received from Gary during his psychiatric evaluation of that defendant on January 9, 1963. Among these facts was a statement by Gary of various other crimes in which he had engaged with Anthony. Dr. Spradley specifically testified that these particular background facts were essential to the forming of a valid opinion as to Gary's mental condition. Over objection by Anthony's counsel he was permitted to so testify. Prompt, clear and emphatic precautionary instructions were delivered to the jury by the trial court and repeated in his charge.

In *State v. Lucas, supra*, 30 *N. J.*, at *p.* 79, we said that

"* * * the introduction of the testimony is permissible where the psychiatrist asserts that it constituted a necessary element in the formulation of his opinion. In that event, the testimony should be circumscribed by an appropriate limiting charge by the trial court to the effect that it should not be considered by the jury as substantive evidence relating to the question of guilt or innocence of the accused, but only as evidence tending to support the ultimate expert conclusion of the psychiatrist on the question of insanity. * * *"

See also *State v. Whitlow, supra; State v. Reynolds, supra,* 41 *N. J.*, at *p.* 179. There was here complete compliance with those requirements. The fact that the statement concerned and implicated a codefendant is irrelevant to the issue. See generally Point I, *ante.* We therefore find no error.

## VII.

In his final point Anthony argues that the prosecutor's remarks in his summation were improper and prejudicial, contending that the prosecutor argued that the jury should convict as a deterrent to other criminals. Even though we assume, for the purpose of this opinion, that the defendant is correct in his appraisal of the purpose of the State's remarks, it does not follow that the conviction should be reversed. See *State v. Johnson, supra,* 31 *N. J.,* at *p.* 511; *State v. Smith,* 27 *N. J.* 433, 460–462 (1958).

In the instant case the court in its charge stated:

"Any statements made by the Prosecutor during his summation with respect to his opinions concerning the need of society to be protected from criminals shall be disregarded by you and shall in no way influence you in determining the facts of the case nor shall they be considered by you on the ultimate question of guilt or innocence of either defendant."

This emphatic and impressive direction by the court was sufficient to rob the challenged remarks of any prejudicial effect under the facts here present.

### B.

We proceed to a consideration of Gary's appeal. He argues that the trial court erred in:

(1) Not finding his confession involuntary as a matter of law;

(2) Denying his motion for acquittal on the basis of lack of corroboration of his confession;

(3) Denying his motion for acquittal on the grounds of insanity at the time of the commission of the crime;

(4) Its charge as given and its refusal to charge his requests;

(5) Various evidentiary rulings.

He also argues that the remarks of the prosecutor constitute reversible error.

As with Anthony, we shall consider Gary's alleged grounds for reversal in the above order.

## I.

The defense contends that the formal confession obtained from Gary was involuntary as a matter of law, and as such should have been excluded. The State's version of the circumstances surrounding the confession, as elicited both on *voir dire* and before the jury, is as follows. Based upon Anthony's confession implicating Gary, the State Police obtained permission from the Attorney General's office to question him at Annandale Reformatory where he was then imprisoned for another offense. On December 26, 1962 four State Police detectives went to Annandale at 1:00 P. M. to interrogate him. They were introduced to Gary (then 17½ years old) by an Annandale correctional officer. The interview was conducted, after Gary had had his lunch, in the administration office which was well lit and comfortably heated. The questioning was done by two detectives, the other two remaining in an adjoining room with a sergeant and a lieutenant of the Annandale staff. The Annandale officers testified that they were present to protect Gary's rights. The communicating door remained open at all times. At approximately 3:00 P. M. Gary was supplied with a soft drink. He was given Anthony's statement to read but refused. At about 4:45 the interrogation ended and he was taken to the control center for dinner. During the course of his meal he told Lieutenant Waltz of the Annandale staff that he had problems and was advised to tell the truth. After the meal Gary requested to see the State Police detectives again, who were then getting ready to leave. At 5:30 P. M. he met with them and orally confessed to his part in the crime, *i. e.*, being the robber with the claw hammer. He then wrote out a confession in longhand. The police thereafter advised him that any statement by him must be free and voluntary and could be used against him, and proceeded to type the formal question-and-answer statement which was

later admitted at his trial. He read this latter statement, acknowledged its correctness, and signed it at 7:23 P. M.

▆ Gary refused to testify during the initial hearing before the judge on the voluntariness of the confession, stating that he wished only to recount the facts to the jury. However, he did introduce expert medical testimony in an attempt to prove that even under the State's version of the facts his mental and emotional state was such that the confession was necessarily coerced. It was clearly established that Gary had a history of mental problems. Dr. Kosofsky, a psychologist, described Gary as being of borderline intelligence, and testified that at the age of 13 he was tentatively diagnosed as being a chronic undifferentiated schizophrenic and that he was probably at times legally insane. On July 3, 1962 (after the murder but before he became a suspect) he was transferred from Annandale to the Trenton State Hospital, where he remained until September 17, 1962 (some three months before the confession). While a patient at the State Hospital he was again diagnosed as a chronic undifferentiated schizophrenic and received a series of 20 electro-shock treatments. When returned to Annandale he was in a state of remission from his psychotic episode. It was conceded by both sides that such treatments disorient and confuse a patient and substantially affect his memory for some period of time. Doctor Rushton, the defendant's expert, testified that at the time of his confession his mental functions were still impaired as a result of the shock therapy. The two State psychiatrists, and one of the defendant's experts on cross-examination, were of the view that he had sufficiently recovered from the effects of his schizophrenic episode by December 26, 1962 to truthfully and knowingly confess to the crime. The trial judge, in an extensive and well reasoned conclusion, found the confession voluntary. Our careful review of the testimony convinces us that he reasonably concluded that although Gary was still suffering from the basic mental illness at the time of his confession he was in a state of remission with no severe problems of disorientation or memory loss. On such a state of

facts the trial judge properly found the confession to be voluntary.

The law determinative of this issue is discussed *ante*, under Point II of Anthony's appeal. Neither *Haley v. Ohio, supra,* nor *Gallegos v. Colorado, supra,* requires a conclusion that Gary's confession is inadmissible.

The defendant sought by his testimony before the jury to demonstrate that he had been subjected to physical and psychological coercion by the police during their questioning of him, *i.e.*, he was questioned continuously for more than seven hours, and was physically mistreated. He as well testified that during his interrogation by the police he had on several occasions requested counsel and an opportunity to see his mother, thereby attempting to exclude the confession under *Escobedo*. The police on rebuttal specifically denied all of the above allegations.

In *State v. Sullivan*, 43 N. J. 209 (1964), we said, at p. 226:

> "No reason was advanced why, if its voluntariness was in question, the supporting evidence was not offered at the proper time in the trial. When such an issue is to be raised, the long established procedure for handling the admissibility of confessions must be followed. Counsel cannot be permitted for tactical reasons to withhold such evidence when the 'trial within a trial' of the competency of the confession takes place, and then after the court has ruled the statement admissible, seek to present the allegedly contesting proof during the defense. As we said plainly in *State v. Tassiello*, a defendant should not be allowed to withhold the proof and offer it later as part of his defense, except for some extraordinary reason which appeals to the trial judge's discretion and sense of justice. 39 N. J., at p. 292, *fn. 2.*"

There being no sufficient reason why defendant did not offer his proof on the judge's inquiry into the voluntariness of the confession, the judge's finding of voluntariness cannot now be questioned on the basis of it. At any rate we have considered that testimony in the light of both the State's original proof and rebuttal testimony and are satisfied that the confession was wholly voluntary, that defendant did not request counsel and that *Escobedo* does not apply.

## II.

Gary argues that there was insufficient independent evidence introduced at the trial to corroborate his confession. What we have said earlier concerning a similar contention by Anthony applies with equal force to Gary's alleged ground of error. There was certainly sufficient corroborative evidence by Russell and other state witnesses for the jury to draw an inference of trustworthiness, *e.g.*, the kind of weapons used, the number of and position of the persons in the tavern at the time of the crime, the fact that Russell took the wallets, the amount of Gary's share of the robbery proceeds, the fact that the three felons went to a diner on Route 130 after the murder. We therefore find no error.

## III.

It is urged in Gary's behalf that at the close of the testimony reasonable men could not differ on the question of his legal insanity at the time of the commission of the crime, and that his motion for acquittal on this ground should have been granted

On direct examination Dr. Rushton, Gary's psychiatrist, testified that Gary was legally insane on the date of the commission of the crime. However, he admitted on cross-examination that his diagnosis was based primarily on the history given him by Gary in his one-hour examination on March 27, 1964, and that Gary then had a faulty memory. It follows that the value of his expert opinion must rest largely on the veracity of Gary's statements and hence a factual issue was raised as to the validity of his opinion. To substantiate his conclusion of insanity during January of 1962, Dr. Rushton also relied on the tentative diagnosis of schizophrenia when Gary was 13 years old and his admittance to the State Hospital, after the commission of the crime, as a schizophrenic. Based on these same facts the two State psychiatrists and one of defendant's own experts would not, with

any degree of medical certainty, express an opinion on the question of Gary's legal sanity or insanity on any particular day during the interim period, even conceding that he might have been legally insane when admitted to Trenton State Hospital in July of 1962.

 The question of insanity is one of fact for the jury. *Cf. State v. Lucas, supra,* 30 *N. J.,* at *p.* 67; *State v. Scelfo,* 58 *N. J. Super.* 472, 478 (*App. Div.* 1959), certif. denied 31 *N. J.* 555 (1960). All that the defense showed in the instant case was that the defendant was possibly legally insane at age 13 and was probably legally insane several months after the crime. While these proofs may increase the probability of insanity in January of 1962, they do not show insanity under *M'Naghten* at the time of the crime as a matter of law. *Cf. State v. Scelfo, supra,* 58 *N. J. Super.,* at *p.* 480.

The trial judge did not err in denying Gary's motion, and in submitting the question of insanity to the jury.

## IV. AND V.

As to Gary's alleged grounds of error based upon the trial judge's charge and failure to charge as requested, and on his evidentiary rulings, we have examined the record and find no error.

## VI.

 Gary argues, as did Anthony, that the prosecutor urged that the jury should convict as a deterrent. What we said above in relation to Anthony's like argument is equally applicable here. The State's remarks, in light of the court's charge, do not constitute prejudicial error.

Affirmed as to both Anthony Ordog and Gary Rush.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For reversal*—None.