110 N.J. Super. 585 (1969)
266 A.2d 326
STATE OF NEW JERSEY, COMPLAINANT-RESPONDENT, IN THE INTEREST OF B.D., A JUVENILE, JUVENILE-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 6, 1969.
Decided May 16, 1969.
*586 Before Judges SULLIVAN, FOLEY and LEWIS.
*587 Mr. Donald H. Mintz argued the cause for the juvenile-appellant.
Mr. David S. Baime, Assistant Prosecutor, argued the cause for complainant-respondent (Mr. James P. Zazzali, Assistant Prosecutor, of counsel and on the brief; Mr. Joseph P. Lordi, Essex County Prosecutor, attorney).
The opinion of the court was delivered by SULLIVAN, S.J.A.D.
B.D., juvenile-appellant herein, appeals from an adjudication by the Juvenile and Domestic Relations Court of Essex County finding that he committed acts of juvenile delinquency involving two homicides.
D., then age 16, was tried in September 1965. At the conclusion of his trial, the court determined that he was "guilty of the homicides" charged in the complaint. D. was committed to Menlo Park for diagnostic evaluation. After receiving the diagnostic report, the trial court made a determination "that it is murder in the second degree." D. was committed to the New Jersey State Reformatory at Bordentown for an indeterminate period under the statute.
The record shows that following the adjudication of delinquency, assigned trial defense counsel consulted with the Essex County Legal Aid Association about the prosecution of an appeal on behalf of D. It appears that defense counsel thought that the Legal Aid Association would undertake to prepare appeal papers on behalf of D. and the Legal Aid Association believed that defense counsel would attend to this matter. As a result of this misunderstanding no notice of appeal was filed at that time, and it was not until July 1967, when D. made inquiry to this court about an appeal, that the misunderstanding came to light. Thereafter, applications for leave to appeal as an indigent and for assignment of counsel were filed on behalf of D. On November 14, 1967 this court granted D. leave to appeal as an indigent nunc pro tunc February 3, 1966. D.'s trial counsel was assigned to prosecute the appeal on his behalf.
*588 A summary of the essential facts as presented by the State is as follows.
On June 4, 1965, at about 1:45 A.M., the police were called to 170 Charlton Street, Newark, where they found the body of V.S. lying on the sidewalk. The police observed a stab wound in her chest. She was pronounced dead by a doctor who was summoned to the scene. Later that same morning, at about 5:10 A.M., the police were summoned to 150 Charlton Street where they found the body of R.B. lying in a vacant lot. He was also pronounced dead at the scene. The policemen testified that there were numerous stab wounds in B.'s chest and back, lacerations on his face and forehead, and a wound on the back of his head. One of the officers found a piece of concrete lying nearby, which he testified contained traces of blood and hair on it. The officer described the piece of concrete as "maybe eight inches long" and "odd shaped." He was unable to approximate its weight. The piece of concrete was produced at trial and a laboratory report of an examination of it by Edel Laboratories, stipulated in evidence, stated that the piece of concrete was "stained within human blood that reacts for human blood, type `O' (International Nomenclature). Short black hairs are also present."
An autopsy was performed on both bodies on June 4 by Dr. Albano, Essex County Medical Examiner. His examination disclosed that V.S. had died of a stab wound in her chest which partially severed the ascending aorta and extended through the right side of the pericardial sac. The stab wound extended downward and backward from the victim's left to the right. Based on the direction of the wound, Dr. Albano expressed the opinion that probably the assailant was righthanded. He also found a stab wound on the right side of the upper lip which was some five-eighths of an inch in depth.
The autopsy of R.B. disclosed five stab wounds on the left side of the chest. The wounds extended backward and downward from the left to the right. The autopsy also disclosed *589 two stab wounds in the victim's back. Dr. Albano stated that, except for one of the back wounds, the direction of the stab wounds indicated a righthanded assailant.
The autopsy also disclosed several bruises and lacerations on B's face and forehead, which Dr. Albano thought could have been caused by a fall or by some kind of a blunt instrument. Dr. Albano thought that these wounds "were not severe enough to cause any effect on the man's actions." Dr. Albano testified that he found no wounds or bruises on the back of B.'s head and, in fact, found no wound at all above the hairline, the only head wounds being the aforementioned lacerations and bruises on the victim's face and forehead. A toxological report showed that B. was "quite drunk" (.237%) at the time of death.
Detective George Alford, a member of the Newark Homicide Squad assigned to the case testified that during the course of his investigation he received information from an informant that B.D. had committed the two homicides. On June 10, 1965, he and Detective Miano went to the home where D. lived with his mother, brought D. to police headquarters and questioned him for more than half an hour about the two homicides. D. who was 15 years old at the time (he became 16 on June 29, 1965), denied having any knowledge of the crimes. Alford did not believe D., but sent him home. About two weeks later he met D. and a friend on the street, brought them to police headquarters, and again questioned D. about the homicides. D. was then sent home. Alford admitted that during the interrogations he mentioned some of the details of the crimes to D., including the information that the two victims had been stabbed to death and that the man had been hit by a rock. However, he denied that he showed D. photographs of the scenes of the crimes and of the victims until August 10, the date the confessions hereinafter referred to were obtained.
Two days later D. and his mother came to police headquarters by appointment and a polygraph test was administered to D., with the verbal consent of his mother. During *590 the test D. was again questioned about the homicides on Charlton Street. Answering the polygraph questioning D. said that he had heard some of his friends talking about the homicides. After the test, D. was allowed to go home.
On August 10, 1965 D., who was then at the Youth House in custody on a juvenile charge unrelated to the homicides, was visited by Alford, who told D. he had checked out the information given during the polygraph test and found it to be untrue. On this date, Alford and Detective Rowinski took D. from the Youth House and drove over to Charlton Street. D. was confronted with information the police had about the crimes and was told that the polygraph showed he was lying. While they were parked at the scene, D. told Alford that he wanted to tell about the incidents.
At this point, Alford told D. not to say anything else, that he didn't have to tell anything if he didn't want to unless he had a lawyer or his mother present. D. said that he didn't need his mother, that he just wanted to tell about it. They drove back to police headquarters where D. gave an oral statement. Alford then took D. back to the Youth House where written statements were taken from him as to the two homicides. Present at the time were Detectives Alford and Rowinski from the Homicide Squad, Detective Rissler from the Essex County Prosecutor's Office, Detective Bongiovanni from the Youth Aid Bureau, and Assistant Prosecutor O'Keefe.
D. was advised of his rights as set forth in printed forms of preambles which he signed. Two statements were thereafter taken from him in question and answer form, in which he admitted committing the two homicides. The questions and answers were transcribed by Detective Rowinski. D. read the statements over, had a minor correction made on one, and signed them. The taking of the statements encompassed a period of about two hours. In the statements, D. said that he killed B. first. He said he had had an argument with his sister about his supper, which she refused to fix, and he had to fix himself. He left his house about 9 P.M. and was walking along Charlton Street and saw a man walking *591 on the other side of the street. D. crossed the street and started walking behind him. The man turned around, looked at D. and then turned back and started walking again. D. said that he came up behind the man, picked up a rock and hit him with it on the back of the head and just kept hitting him. "Then I went back and I stabbed him. He was laying on the ground. I just kept stabbing him. I don't know how many times."
After stabbing the man D. stated that he continued walking along Charlton Street with the knife in his hand and came upon a woman who was walking ahead of him. As he came abreast of her D. stated that he "slung my left arm back and the knife hit her somewhere around her neck and chest. Then I started running." D. said that after the stabbings he went in the Harlem Bar which was just around the corner and stayed for around half an hour. While in the bar, he spoke with a lady and told her he had a fight with a man and had stabbed him and had also stabbed the woman who was with the man. D. stated that he and the lady left the bar together and he then went home.
The State also presented the testimony of the detectives and the assistant prosecutor, who were present at the Youth House, that D. had been fully advised of his rights and had given the statements voluntarily without any threats, force, or compulsion. In particular, the assistant prosecutor testified that he was present at the Youth House not only as a representative of the prosecutor's office but also to protect D.'s rights. He said that he went over the preamble with D. word by word, not merely reading it but explaining it to him.
The trial court admitted D.'s confessions into evidence over objection, finding that they had been voluntarily given; the court stating that it had been impressed with the testimony given by the assistant prosecutor. At the conclusion of the State's entire case, the court denied D.'s motion to dismiss the complaints ruling that the confessions, together *592 with other proofs presented by the State, were sufficient to establish a prima facie case.
B.D., testifying on the issue of voluntariness and in his own behalf, said that in addition to the interrogations detailed by Detective Alford there were two other occasions on which he was summoned to police headquarters and questioned about the murders, so that August 10 was actually the sixth time he had been questioned by the police. D. said that although he did not commit these crimes he finally admitted to them to get the police off his back, that he was sick and tired because every time he turned around he was looking at them and "had to go down to them," and that "if a person bothers you long enough you would do just about anything to get rid of him." D. said that he pieced together the details of the crimes as set forth in his two confessions from what Detective Alford had told him about the crimes, the photographs of the scenes of the crimes and the victims which had been exhibited to him by Alford, and his imagination. In particular, D. testified that he had included the detail about going into the Harlem Bar and telling a lady there that he had stabbed two people in his confessions because Detective Alford told him that the man who had committed the stabbings had done that.
D. also said that on August 10, when the police took him from the Youth House he was told that he wouldn't get away with it, that he was scared and, at police headquarters, Detective Alford kicked him in the leg several times.
Both D. and his mother testified that he was and had always been lefthanded. The Social Service Report of January 4, 1963 marked in evidence states that "B.D. is lefthanded."
At the conclusion of all of the testimony, the court rendered its decision that it was satisfied that the confessions had been voluntarily given, and that "the facts of the State's case were substantiated by such confession." *593 As heretofore noted, the court found that defendant had committed the two homicides.
This case was tried in 1965 prior to the landmark decision in State in the Interest of Carlo, 48 N.J. 224 (1966). We conclude that the principles set forth in that decision here control and that the confessions made by D. should have been excluded from evidence on the ground that it does not adequately appear that they were obtained by methods consistent with due process and which vouch for their trustworthiness. In addition, we conclude that the confessions, even if admissible, were not corroborated within the requirement of State v. Lucas, 30 N.J. 37 (1959), and were insufficient to establish a prima facie case.
It is true that the proofs indicate that D. was advised of his rights and told that he could have a lawyer and his mother present if he so desired. Assuming D. was told these things, this did not render his confessions voluntary in the constitutional sense. The proof is undisputed that over a two-month period D. was questioned repeatedly by the police who did not believe his protestations of innocence. It was only on the fourth (Detective Alford's testimony) or sixth (D.'s testimony) interrogation that he finally told the police that he had committed the homicides. D. said that he finally admitted to crimes he did not really commit because every time he turned around the police were at him and bringing him down to police headquarters. The confessions in question were taken in a room in the Youth House. Present were five law enforcement officers and D., who had just passed his 16th birthday. As pointed out by Chief Justice Weintraub in his concurring opinion in Carlo:
* * * [T]here should be every assurance that the juvenile was not led into a false account, and to that end, at least if the offense is a serious wrong, the police should see that a parent or some relative or friend is present, if it is at all feasible, to allay the fear or pressure the youngster could feel in strange hands and a strange setting. And of course a parent cannot be excluded because the infant wants it that way; the decision is the parent's and not the child's. * * * *594 And because of the ease with which some boys may yield to suggestion, I would insist upon a quantum of corroboration we do not now demand with respect to confessions of adults. * * * 48 N.J. at p. 245.
The efforts of the assistant prosecutor to explain to D. what his rights were cannot be considered a substitute for legal or parental representation. Under the circumstances here presented, having his constitutional rights explained to him was not enough. There is no competent evidence that any effort was made to communicate with D.'s mother and have her present during the confrontation so vital to the juvenile's interests.
It is significant that in the instant case, a material part of D.'s confession as to B. seems to be at odds with the results of the autopsy performed by Dr. Albano. D.'s confession states that he came up behind B., picked up a rock and hit him with it on the back of the head and kept hitting him. This is consistent with the testimony of the police officers that B. had a wound on the back of his head and that they found a piece of concrete lying near B.'s body with blood and strands of hair on it. However, the autopsy showed that B. had no such wound. Indeed, there were no wounds above the hairline, the only injuries to the head being lacerations and bruises on the face and forehead. This apparent disparity cannot be overlooked, since it not only raises a question as to the veracity of the confession, but also indicates that D. may well have yielded to suggestion.
We are not unmindful of the Laboratory report as to the piece of concrete. However the blood could have come from B.'s stab wounds. (The police testified that the piece of concrete was found alongside B.'s body by the right shoulder.) The report, while it identifies the blood on the piece of concrete as human, does not do so with the short black hairs.
The autopsy of both victims disclosed an additional item of importance. The fatal stab wound on V.S.'s body, and *595 six of the seven stab wounds on R.B.'s body, were downward and backward and from the victim's left to right. Dr. Albano said that this indicated a righthanded assailant. The evidence in the case is undisputed that B.D. is and has always been lefthanded. His confession as to V.S. states that he stabbed her with a backward swing of his left hand. Since his confessions set forth that after stabbing B. he continued walking along the street with the knife in his hand until he overtook the woman, the clear inference is that he claims he also stabbed B. with the knife in his left hand.
All of the foregoing, taken together, creates such serious doubts as to the voluntariness and trustworthiness of these confessions, that we conclude they should have been excluded.
Aside from the question of voluntariness, we are satisfied that the confessions lacked any substantial corroboration and, standing alone, were insufficient evidence of guilt. It was undisputed that the two victims had been stabbed to death. However, the only proof in the case to connect D. with the killings was his own confessions. There was no other implicating evidence. In State v. Lucas, supra, 30 N.J. at 56, it was held that where the State proves the fact that a crime was committed and that the defendant had confessed the commission of such crime, the State must also introduce independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness. (As heretofore noted, Chief Justice Weintraub in Carlo would insist on a quantum of corroboration of a juvenile's confession not now demanded with respect to confessions of adults.)
In Lucas, the court found the necessary support in the independent evidence presented by the State, which verified important details of the defendant's confession. To the same effect is State v. Ordog, 45 N.J. 347 (1965), where commission of a crime having been shown, the court found a confession was sufficient to sustain a conviction since *596 other evidence in the case corroborated many of the details contained in the defendant's confession. The court noted that these details would have been known only to a participant in the crime and there was absent any explanation of how the defendant would have had knowledge of them except by his own observations as a participant.
The State argues that it has met the test outlined in Lucas because D.'s confessions are consistent with the known facts about the homicides as contained in the State's independent proofs. Actually, D.'s confessions contain practically no verified details other than the statements of having stabbed the two victims and, as we have previously noted, in one material regard, D.'s confession as to the killing of B. seems to be at odds with the autopsy report. However, it is undisputed that D. was told many of the facts of the case by Detective Alford and was shown photographs of the scenes of the crimes and the bodies of the victims. D. himself testified that he pieced together his confessions from these sources and his imagination. There is no indication that Alford withheld material information concerning the killings from D. so that he could test the veracity of any statement made by D. See: State v. Lucas, supra, 30 N.J. at 48.
The result is a situation where the record contains a rational explanation of how D. knew the facts of the killings as set forth in his statement so that no real inference of trustworthiness can properly be drawn from any consistency shown. See: State v. Ordog, supra, 45 N.J. at 364.
The judgment of the juvenile court is reversed and the cause remanded for further proceedings not inconsistent with this opinion. See: State v. Serrano, 53 N.J. 356, 360 (1969).
LEWIS, J.A.D. (dissenting).
With deference to the opinion of the majority court, I am constrained to vote for an affirmance and, accordingly, note my reasons for dissenting.
*597 After a study of the record, I am satisfied that D's confessions were voluntary and properly admitted in evidence and that the State's proofs were sufficiently corroborative of the critical facts and circumstances to sustain the trial court's finding of guilt.
Two homicides were committed in the same area and within a relatively short time. The statements that D. signed at the Youth House were typed by Detective Rowinski, who testified that they were "exactly" as given to him.
As to decedent R.B., D. was requested to "tell us as best as you can remember what you did on that day [June 4, 1965]." He replied:
It was about 8:00 in the night and I asked by sister, M. to fix me some supper. So, she wouldn't fix it so I fixed it myself. She said I had better fix it myself cause she wasn't going to fix it. So I fix it myself and I told her don't give me no smart answer. Then I went in my room and I got dressed. Then I left and walked out the house. It was about 9:00 then. I figured I'd go out for about an hour til 10:00. I wasn't mad at nobody then. So I walked down Montgomery Street. I saw a lady and I didn't pay no attention to her. She was a short lady and she was kind a drunk, I say intoxicated. I walked down to Prince Street and then I walked through Prince Street to Spruce Street and I walked up Spruce Street to Charlton Street and I walked through Charlton Street. I was walking from Spruce Street towards Montgomery Street. When I was walking I was about a third of the way into the block and saw this man walking on the other side of the street. * * *
So I looked at him and kept on walking and looking at him. I didn't have nothing in particular in my mind. Then I just turned around, walked across the street and started walking behind him. He was going toward Spruce Street and I was behind him. Then he must have heard me coming and he turned around and looked at me. Then he turned back around and started walking. Then I picked up a rock and hit him with it on the back of the head and I just kept on hitting him. Then I started to walk away. Then I took a knife outta my pocket. Then I went back and I stabbed him. He was laying on the ground. I just kept stabbing him. I don't know how many times. After I stabbed him in the back he raised up on his elbow and I just kept on stabbing him some more. I don't know what I did it for. I don't know what I did it for. I felt I had the urge to do something. Then I just walked away and I left the man laying there and I still had the knife in my hand. Then I was walking and *598 I was going towards Spruce Street, and I saw a lady and I swung my arm back and I started running. * * *
As to decedent V.S., D. narrated the events thusly:
I don't know the woman's name, but after I had beat up and stabbed a man in an empty lot on Charlton Street, between Montgomery Street and Spruce Street, I walked down Charlton Street towards Spruce Street. I saw a woman walking towards Spruce Street on Charlton Street.. She was about three or four doors in from Spruce Street, and I had my knife in my hand and when I was about shoulder to shoulder with her, I slung my left arm back and the knife hit her somewhere around her neck and chest. Then I started running.
In considering whether the method used in obtaining D.'s confessions can be squared with the due process of law commandments of the Fourteenth Amendment, we should, as indicated in State v. Smith, 32 N.J. 501, 555 (1960), certiorari denied 364 U.S. 936, 81 S.Ct. 383, 5 L.Ed.2d 367 (1961), "look at the question in the light of the age, intelligence and experience" of the particular juvenile "as well as of the period of time involved and how that time was utilized." See Haley v. State of Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948).
It has been said that the "Determinative factors include not only illegal detention but its duration, the relentlessness of interrogation, disregard of the rudimentary necessities of life, the deprivation of counsel, deception respecting the accused's constitutional rights, the accused's age, education, emotional characteristics, and experience in criminal matters." People v. Price, 24 Ill.2d 46, 57, 179 N.E.2d 685, 691 (Sup. Ct. 1962), quoted in People v. Hester, 39 Ill.2d 489, 237 N.E.2d 466, 473 (Sup. Ct. 1968), certiorari granted April 7, 1969, 394 U.S. 957, 89 S.Ct. 1310, 22 L.Ed.2d 559, wherein a boy, 14 years of age and of below normal intelligence, confessed to the sexual assault and murder of a schoolteacher; she had been stabbed repeatedly in *599 the side and chest. The confessional statement, taken at the office of the State's Attorney in the presence of the assistant State's Attorney, a court reporter and a police sergeant, was substantially identical to statements previously given to the investigating officers. The Supreme Court of Illinois, after discussing and distinguishing Haley and other related decisions, concluded that defendant's confession was not coerced and was properly admitted in evidence.
The record before us reveals that the police investigation led to D. who, at first, not only denied any knowledge of the crimes but refused to give an account of his actions; he was disbelieved by the police. He later told a "story" which was checked out and found to be false. While D. was riding with Officers Alford and Rowinski on August 10, 1965, he was advised that the information he had given was untrue and, as they approached the scene of the murders, he "pointed" to the lot stating that "he wanted to tell about it, tell what happened."
The statements in question were taken at the Youth House in the early afternoon of the same day (between 1:20 and 3:45 P.M.) during which time D. was served lunch. It is undisputed that he was advised as to his constitutional rights. The assistant prosecutor (who had had 22 years prior experience with the FBI) testified that he was there to protect defendant's rights as well as those of the county. He stated further that the preambles were read in detail and explained "line by line," that prior to signing the statements D. read them out loud in their entirety and that the youth "expressed himself understandably and had no difficulty in the language because this was his language, actually." The evidence suggests that the witness endeavored to discharge his responsibility "to see that Justice is done" as required of him under Canon 5 of the Canons of Professional Ethics, he did not have the benefit of the salutary admonition enunciated in the subsequent decision of State, in the Interest of Carlo, 48 N.J. 224 (1966), quoted in the majority opinion.
*600 D. gave this testimony:
Q. From 1:20, from the time you came back here [Youth House] and they were present, did anyone assault or threaten you?
A. No, they treated me pretty good. * * *
Q. Well, until the statements were fully completed, is that correct?
A. Yes.
Q. Incidentally, is everything that Detective Reitzel said, when he got here, the truth?
A. Reitzel, O'Keefe and the other guy were telling the truth. Alford wasn't telling the truth altogether.
The boy's parents were separated. According to his testimony, he was living with his mother; he qualified it, however, by saying: "Yes, but I wasn't home. I didn't stay home that much. I spent a lot of time some place else." In the New Jersey State Diagnostic Center report, it is noted that D. viewed his mother "as an intolerant, punitive figure." It is thus understandable why he said that he did not "need" his mother, and it is unlikely that her presence would have given him any consolation or support or would have had a meaningful influence or effect upon him.
The Diagnostic Center report reflects D.'s background which, while it has no bearing on his guilt or innocence, is noteworthy in the appraisement of his intelligence and experience.
Under "Presenting Problem," his six confrontations with the law since 1962, including charges of atrocious assault and battery, breaking and entering and three larceny offenses, are listed. The "Psychosocial Summary" observes that he was examined by a psychologist who "felt that B. has severely overstrained brittle control over intense hostility and was seen as potentially homicidal in relation to both peers and adults," and that a psychiatrist reported the boy "shows a marked amount of hostility toward any authority figures." In the "Psychological Summary" D. is referred to as "an individual of high Average intelligence with an intellectual potential in the Bright Normal range. * * * patient also has violent and sadistic aspects. * * * His responsivity seems to be canalized into destructive impulsivity and provocative *601 belligerence." The "Prognosis" concludes, "The overall picture seem to be somber as to the possibilities of complete rehabilitation at least in the near future."
Moreover, the independent, assertive and strong will of D. is illustrated by the fact that during both the prosecutor's summation and offer of the confessional statements in evidence, he was repeatedly interrupted by the youth, who was instructed by the court to "be quiet." Notwithstanding the restraining efforts that were made, D. persisted with his disturbances while the trial court was ruling on the motion, provoking the judge to comment, "I am not going to be interrupted any further by him." The record also reveals an outburst by D. "in several obscene terms" at the conclusion of the court's ruling.
It therefore seems clear that the police were not dealing with "an easy victim of the law," the characterization applied to the juvenile in Haley v. State of Ohio, supra, 332 U.S., at p. 599, 68 S.Ct., at p. 304, 92 L.Ed., at p. 228. Note also State, in the Interest of Carlo, supra. The challenged confessions in those cases were held to be inadmissible.
The murder confession in Haley was by a youth younger and less experienced than D. It was obtained after five or six hours of police questioning in relays through the "dead of night." Haley was then held incommunicado for over three days during which time his mother, and a lawyer she had retained, were refused access to him. The Carlo court was concerned with two boys, aged 13 and 15 respectively, who had allegedly caused the death of a girl aged 10. They were taken to a precinct police station for interrogation and their midnight confession was obtained under circumstances "quite similar to those described in Haley v. Ohio" (48 N.J., at p. 238). The youths testified that their confessions, in what appeared to be the language of the typist, were the product of "fear and fatigue" caused by the extensive grilling by the police. Furthermore, the *602 parents of the boys attempted, but were not permitted, to see their sons during the interrogation.
In the instant matter the statements were taken at the Youth House, a place familiar to D., and in the presence of a detective from that agency. As previously noted, the statements were not in the language of the typist, but rather were D.'s verbatim narration of the events. They were not the product of fatigue, fear, panic, prolonged and relentless grilling, or coercive tactics demonstrating official callousness overpowering the will of the confessor. There was no deception respecting the accused's constitutional rights nor any disregard of rudimentary necessities of life. The law enforcement officers did not ride roughshod over a parent-child relationship in order to obtain the confession, albeit they might have taken the added precaution of insisting upon the boy's mother being present. It is apparent, however that D. was alert and sophisticated, and knowledgeable in the ways of crime and criminal procedure way beyond his years. The evidence supports a conclusion that, when D. realized the police knew he was lying, he voluntered to tell what happened and then did so voluntarily and in his own way.
The State's case on the issue of corroboration was weak but it, nevertheless, appears to be sufficient to demonstrate the trustworthiness of the confessions. As stated in State v. Lucas, 30 N.J. 37, 58 (1959), "No greater burden should be required of the State than independent corroborative proof tending to establish that when the defendant confessed he was telling the truth, plus independent proof of the loss or injury." The court further stated, "But safeguards for the accused should not be turned into obstacles whereby the guilty can escape just punishment." Ibid.
The autopsy reports established the deaths of the victims, thus supplying the required independent proof of the "loss or injury."
Although the police, in the course of their routine investigation, made known to D. some of the broad facts as *603 to how the victims were murdered, no one but the perpetrator of the crimes was in a position to recount these descriptive details, of the execution of the murders, which meshed so naturally and logically with the physical evidence that was adduced.
The testimony of the investigating officers as to the conditions of the dead bodies when found, the production of the blood-stained rock, and the evidence supplied by Dr. Albano, who performed the autopsies, substantially buttress the trustworthiness of the confessions.
The alleged discrepancies urged by defense counsel are, in fact, supportive of the validity and truth of his client's statements. D. said that when he was "shoulder to shoulder" with V.S., he "slung" his "left arm back" and the knife hit her somewhere around "her neck and chest." Dr. Albano gave evidence that she died of an ascending stab wound of the chest. There was also a stab wound of her upper lip.
The medical witness also testified that his autopsic examination of R.B. revealed five stab wounds in the left chest, one stab wound "back of the right chest," one stab wound "back of the left chest," and five lacerated wounds of the head. The statement of the accused was that he hit this victim on the back of the head with a rock and "I just kept on hitting him" and while he was lying on the ground "I just kept stabbing him * * * After I stabbed him in the back he raised up on his elbow and I just kept on stabbing him some more."
Two weapons were used  a rock and a knife. That D. may be left-handed and that the doctor expressed the opinion, in view of the direction and angle of the wounds, that the assailant was probably right-handed are of no moment. In his testimony the doctor also indicated that the stabbing "may have been delivered by a left-handed assailant, if he was standing directly behind him [victim]," and testified further:
*604 Q. Doctor as far as what direction the wounds came, concerning the assailant, would it not depend on whether the victim was lying down or standing up?
A. That is true, and it also depends upon the relationship of the assailant with the victim.
Q. And when you say it presumably comes from the assailant's right to his left, that is under the situation where they're face to face?
A. That's right, and that's all I can say.
It is plain from D.'s signed statements that the multiple stabbing assaults were not made when he was face to face with either of the victims.
In totality the proofs as to the facts and circumstances appear to lend sufficient credence to the confessions to meet the test of trustworthiness laid down in State v. Lucas, supra, and State v. Ordog, 45 N.J. 347, 364 (1965), certiorari denied 384 U.S. 1022, 86 S.Ct. 1942, 16 L.Ed.2d 1025 (1966).
To hold that the confessions were inadmissible in evidence and to reverse the judgment of the trial court, even though it be conditional as suggested in the majority opinion  a remand procedure here tantamount to a dismissal of the complaint since additional probative evidence not obtainable in 1965 hardly could be forthcoming four years later  would probably put D. back on the streets of the community to continue exploiting his criminal tendencies. I am convinced that anything short of an affirmance would be a disservice to the juvenile and to society as well.
The following observation of Mr. Justice White in one of the dissenting opinions in Miranda v. Arizona is significantly appropriate. In speaking about the accused in the context of the issues there involved, the Justice said:
* * * Has it so unquestionably been resolved that in each and every case it would be better for him not to confess and to return to his environment with no attempt whatsoever to help him? I think not. It may well be that in many cases it will be no less than a callous disregard for his own welfare as well as for the interests of his next victim. Miranda v. Arizona, 384 U.S. 436, 543, 86 S.Ct. 1602, 1663, 16 L.Ed.2d 694, 763 (1966).
*605 After considering all of the evidence and bearing in mind the findings of the trial judge, who had the opportunity to hear and see the witnesses, I am persuaded that the totality of the circumstances did not amount to involuntariness or violation of due process.
Accordingly, I would affirm.