**UNITED STATES of America,**
Plaintiff-Appellee,

v.

**Raymond O. SOPHER, John Kerestes, John A. Ramza, Michael F. Ryan and Matthew J. Tibbles, Defendants-Appellants.**

**Nos. 15057, 15061.**

United States Court of Appeals
Seventh Circuit.

June 20, 1966.

Rehearing Denied July 19, 1966.

Frank Oliver, Maurice J. Walsh, Edward J. Calihan, Harry J. Busch, Jason E. Bellows, Sherman C. Magidson, Chicago, Ill., for appellants.

Edward V. Hanrahan, U. S. Atty., John Peter Lulinski, John Powers Crowley, D. Arthur Connelly, Douglas G. Brown, Lawrence Jay Weiner, Asst. U. S. Attys., Chicago, Ill., for appellee.

Before DUFFY, SCHNACKENBERG and KNOCH, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Raymond O. Sopher, John Kerestes, John A. Ramza, Michael F. Ryan and Matthew J. Tibbles, defendants, appeal from their convictions of a violation of 18 U.S.C. § 1951. They were tried by a jury and the court sentenced them to prison terms.

Sopher was the mayor of Streator, Illinois, and his co-defendants were commissioners thereof.[1]

Count I of the indictment charged defendants with having obstructed interstate commerce by extortion and count II charged them with conspiracy to commit the offense alleged in count I, all in violation of the Hobbs Act, 18 U.S.C. § 1951.

There was evidence tending to prove the following facts:

On November 7, 1960, Charles H. Boender, a sales representative of Stannard Power Equipment Company, which was agent in Streator for Smith & Loveless, made a sales talk to said defendants on a proposed sewer project in that city. Whereupon Sopher asked Boender "what it was worth" to him to get the job. An unidentified commissioner stated that "it must be in cash".

On January 5, 1961, independent engineers Warren & Van Praag, Inc., submitted plans and specifications for the project, wherein Smith & Loveless was designated as the base bid supplier for the package lift stations.

On March 28, 1961, in Boender's presence, president Bowlby of Stannard thanked Sopher for the consideration being given Smith & Loveless equipment and expressed the hope that the company was going to be successful in doing business with the contratcor. Sopher replied that this was possible, provided they received in cash 10% of the contract or bid price in connection with such an agreement. In addition Sopher suggested that the price could be increased by $3,000 to take care of the internal revenue tax. However, Bowlby told Sopher that Stannard Company could not participate but that he would relate the proposition to Smith & Loveless.

On April 10, 1961, Boender and Smith, managing director of Smith & Loveless, met in Streator. Being unable to locate Sopher, they called on defendant Kerestes, who said he had explained to Boender previously that "we wanted 10 percent of your bid price to the contractor to have the city approve" the use of Smith & Loveless equipment. When Smith asked how "we might accomplish the matter of providing this money" Kerestes explained: " * * * we want the cash, we want it tax paid, and it is your problem how you get it. * * * "

Finding Mayor Sopher at the city hall, Boender and Smith were told by him: "We want 10 percent of the bid price in cash." While Smith made no commitment, he testified that he left Sopher with the impression that "I probably would [go along with the deal]", thus leaving the matter in abeyance so that the Federal Bureau of Investigation could be contacted, which was done on April 11, 1961.

On April 17, 1961, Farthing Brothers, general contractors, after having received bids from the subcontractors, made sealed bids on pump stations manufactured by Smith & Loveless, Chicago Pump Company and Tex-Vit. Farthing Brothers was the lowest bidder on the total sewage project.

On April 19, 1961, Boender telephoned Sopher and asked whether he was satisfied with the arrangements made between Sopher and Smith. Sopher said that he was and that he would have to satisfy "the commissioners".

1. 24 Ill.Rev.Stat.1965, art. 4.

On June 7, 1961, a contract was entered into between the city and Farthing Brothers in which Smith & Loveless was the only subcontractor specifically named. Both Boender and Smith believed that Smith & Loveless received the contract because of the agreement to pay the 10% of its contract price of $30,868.

On February 15, 1963, Smith & Loveless received its final payment from Farthing Brothers and three days later Sopher called Boender to arrange a meeting.

On May 7, 1963, Smith, Sopher and his twelve-year-old daughter met in a room in a Chicago hotel. On Smith's person federal agents had a hidden recording device, and $3,087 in identified money. The recorded conversation thereon is in conformity with the facts herein enumerated, culminating in Smith's statement " * * * well, I might as well give you the money," (which he did). Federal agents then appeared, arrested Sopher and recovered the listed money. Whereupon Sopher contended the money received was a political contribution.

1. We hold that the evidence supports the charges in the indictment and that the indictment includes all elements of the offenses charged.

As the Supreme Court said in Stirone v. United States, 361 U.S. 212, at 215, 80 S.Ct. 270, at 272, 4 L.Ed.2d 252 (1960):

> " * * * It was to free commerce from such destructive burdens that the Hobbs Act was passed. United States v. Green, 350 U.S. 415, 420 [76 S.Ct. 522, 525, 100 L.Ed. 494]."

and 361 U.S. at 218, 80 S.Ct. at 274, the court added:

> " * * * there are two essential elements of a Hobbs Act crime: interference with commerce, and extortion. * * *"

We agree with government counsel when they say that the conduct of defendants necessarily produced a fear of economic loss by Smith & Loveless. United States v. Kramer, 7 Cir., 355 F.2d 891, 897 (1966).

We hold that the violations of the Hobbs Act charged in the indictment were supported by the proof in the record.

2. However, defendants contend that the transcript and tape recording of the conversation on May 7, 1963 between Smith and Mayor Sopher were statements producible under 18 U.S.C.A. § 3500. There were motions by the defense to strike the testimony of Smith, grant a mistrial, and to produce said statements, which were respectively denied.

While the record indicates that the government turned over to the defendants various statements of witnesses in compliance with § 3500, it took the position below and also in this court that the court did not err in denying defendants' motion for the production of the tape recording of the May 7, 1963 conversation and the transcript thereof. The district court took the position that § 3500 does not encompass the tape recording of that conversation.

■ ■ A § 3500 statement is a recorded recital of past occurrences made by a prospective prosecution witness. From its very nature, necessarily it is made after those events have taken place. If a prosecutor, in reliance on the statement, uses as a witness the maker thereof as a part of the government's case, the statement must be produced for the use of defense counsel. But a concurrent tape recording of a conversation between the payer and the recipient of an alleged cash bribe is obviously of contemporaneous sounds. The result is a preservation of a conversation just as it was spoken. It is direct evidence relevant on the issue of the alleged guilt of the defendants on trial. Made when the allegedly extorted bribe money was being paid, the tape recording in this case is of the actual voices of the briber and the bribee. It is therefore *not a recital of a past occurrence by a prospective witness* and is not within the general purview of § 3500. Moreover, it does not fall within the

technical requirements of paragraph (e) [2] thereof, because it is not a written statement made and signed by a government witness or adopted or approved by him, nor is it a recording or transcription thereof which is a substantially verbatim recital of an oral statement by said witness *to an agent of the government*, contemporaneously recorded with the making of such oral statement.

■ We hold that there was no error committed in the denial of the motions of defendants to strike Smith's testimony and for an order for production of said statements, or to grant a mistrial.

3. During the government's case in chief, Smith testified as to the May 7, 1963 conversation with Sopher at the Water Tower Inn. Sopher, as a defense witness, under cross-examination answered evasively when asked about statements contained in the recording attributed to him by Smith, who testified that he recognized Sopher's voice when the playing of the tape was repeated.

A transcript of the tape had been delivered by the government to defense counsel at their suggestion. The tape was played in their presence, but outside the presence of the jury and of any spectators, after the defendants severally and personally agreed to the procedure.

Counsel for Sopher assumes in this court that "certain parts of the conversation as testified to by Sopher, were not on the tape" and he points out as "a possible explanation" that he reminded the jury that Smith controlled the operation of the recording device "and could" delete statements by Sopher which were not to his liking, by pushing the "off" button. Sopher's counsel points out that the Federal Bureau of Investigation agent had instructed Smith in the mechanical use of the recording device.

. On rebuttal by the government, Smith testified that the tape recording fully, truly and accurately portrayed the conversation with Sopher on the occasion in question. He further testified that only general instructions regarding the operation of the device were given. Moreover, the lack of a basis for the attack on the reliability of the tape was acknowledged by counsel for Sopher, when he then stated:

"Vis-à-vis my comments just before the recess, I should like the jury to understand that in my opinion the record will not sustain the inference that the machine which Mr. Smith had fastened to his body on May 7, 1963, was in fact turned on or off by Smith during that conversation, and I think it also will not sustain the inference that there was matter on that tape which tended to corroborate Mayor Sopher's version of the conversation but which was not stipulated to."

As a matter of fact, our attention has not been directed to any conversation on the occasion in the Water Tower Inn which the tape failed to record. It is therefore improper for us to speculate what would be missing from the record if Smith had arrested the operation of the machine temporarily at any time.

■ 4. Defendant Kerestes contends that the court erred in failing to grant him a severance from Sopher, on the ground that the latter had made admissions and statements tending to implicate Kerestes, and also that he was unable in a joint trial with Sopher to compel effective testimony from his co-defendant. We fail to find sufficient basis in the record for reversing, especially as all defendants were charged as members of a conspiracy under count II of the indictment. Certainly the matter of a severance was within the sound dis-

2. § 3500(e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—
(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or
(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement. * * *

cretion of the district judge and there is nothing in the record to indicate an abuse of such discretion when the motion for severance was overruled. Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954).

We find no other ground advanced by Kerestes for a reversal sufficient to justify that action.

5. Under all the circumstances shown by the record, we hold that the court properly denied the respective motions for severance, judgment of acquittal, mistrial and a new trial by defendants Ramza, Ryan and Tibbles.

■ We have considered their contentions that there was a fatal variance between the indictment and the proof. Their counsel reason that the indictment alleged defendants threatened Smith & Loveless, Inc. that its bid would not be accepted unless it agreed to make a payment to them, whereas the evidence showed that Smith & Loveless only made a proposal to the general contractor for the work. We find there was evidence tending to prove that defendants' conduct necessarily produced a fear of economic loss by Smith & Loveless. This evidence is sufficient to support the jury's verdict, on the theory that money had been extorted by defendants by fear, induced by threats that a bid of the contractor would not be accepted unless Smith & Loveless agreed to pay 10% of the bid price, thereby affecting interstate commerce.

6. We have examined the instructions and considered the objections thereto raised by defendants in this court. We find the objections not well taken.

7. While there is a criticism of the action of the trial court in what counsel for defendants Ramza, Ryan and Tibbles say was a reprimand of Sopher's trial counsel, our reading of the entire transcript convinces us that it was not prejudicial to the defendants in any way.

■ 8. Defendants Ramza, Ryan and Tibbles contend that the court committed error in admitting in evidence conversations at the May 7, 1963 meeting between Sopher and Smith which were made "after the completion of the conspiracy." However, we do not agree that the conspiracy had ended when these conversations took place. The conspiracy was still in effect when the meeting took place, the money was obtained by Sopher, and each of the participating persons (Sopher and Smith) continued in their discussion as to the payment of the money to Sopher and its subsequent disbursement to the other defendants in their respective shares. The conspiracy did not terminate until the arrest of Sopher.

For all these reasons, the judgments from which these appeals were taken are affirmed.

Judgments affirmed.