(No. 39588.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LEE ARTHUR HESTER, Plaintiff in Error.

*Opinion filed March 28, 1968.—Rehearing denied May 27, 1968.*

WARD, J., took no part.
SCHAEFER, J., dissenting.

MARSHALL KAPLAN, JEROME FELDMAN, AND EDWARD KAPLAN, of Chicago, appointed by the court, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and JOHN J. STAMOS, State's Attorney, of Chicago, (ELMER C. KISSANE and JAMES B. ZAGEL, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

The defendant, Lee Arthur Hester, age 14, was found guilty of murder by a jury in the circuit court of Cook County and sentenced to a term of 55 years imprisonment. In this direct appeal the defendant claims 18 instances of reversible error occurred in these proceedings.

About 4:00 P.M., on April 20, 1961, the body of Josephine Keane, a teacher at the Lewis-Champlin Elementary School of Chicago, was discovered in the first floor bookroom of the school. Mrs. Keane had been stabbed repeatedly in the side and chest. Her body was found lying face up with her skirt pushed up over the hips. The crotch of her panties and girdle had been cut as well as the loops that held the garter supports attached to her girdle. The coroner found that spermatazoa were present in the victim's vagina, and the autopsy report fixed the cause of death as hemorrhaging due to multiple stab wounds with death occurring between 8:00 A.M. and noon that day.

On April 21, Detectives Sheldon Teller and Anton Prunkle were assigned to investigate the murder, and arrived at the school before daybreak to conduct a search of the premises. About 7:45 A.M. Hester's gym teacher, Miss Virginia Fritsch, talked with them stating that she had seen Hester alone in the hall on Thursday morning, and that she believed Mrs. Keane was handling a disciplinary case which involved him. Miss Fritsch directed the officers to Mrs. Rita Considine, a clerk in the principal's office, as a possible source of more information. Mrs. Considine informed the policemen that Mrs. Keane had mentioned that a parent had complained about the defendant wanting her

son to commit an unnatural act. The detectives then proceeded to the third floor classroom where they met Jean Webster, Hester's fifth grade teacher.

At 8:00 A.M. the defendant arrived in his classroom and Miss Webster directed him to the officers who were waiting outside. The defendant was in the custody of Officers Teller and Prunkle from shortly after 8:00 A.M. until approximately 8:45 A.M. when they turned him over to Sergeant Frank Follis of the youth division. As they were interviewing the defendant outside of his third-floor classroom the detectives noticed what appeared to be bloodstains on Hester's pants and shirt. Detective Teller testified that when the defendant was asked how he acquired the stains on his clothing he gave several answers: that they were due to a fight with another boy; that he had had a nosebleed; that he had cut himself while chopping wood with an ax; and that he cut himself with a saw while sawing wood. Hester testified that as he was being interviewed outside of the classroom Officer Prunkle kicked him in the left shin. This charge was denied by Officers Teller and Prunkle, and their testimony was given support by three school teachers who were present during various portions of the conversation and never saw Hester struck. The defendant did not complain to anyone that morning about being kicked, including a doctor he saw when he was admitted to the Audy Home, a juvenile detention facility.

After questioning Hester on the third floor for approximately fifteen minutes, the detectives took him to the school auditorium where they could use the bright natural sunlight to examine more closely the stains and spots on his clothes. Hester admitted that he knew Mrs. Keane for three semesters or more, but he denied any involvement in the murder. The defendant was then taken to the principal's office and turned over to Sergeant Follis. Hester sat outside the office until 9:00 A.M. when Officers Harold Thomas and Robert Perkins picked him

up and transported him by car to the Audy Home. Upon arrival there, the defendant's clothes were turned over to the officers for removal to the crime laboratory and Hester was provided with a robe to wear. The officers left the Audy Home and did not return there until 4:00 in the afternoon. Between 10:00 A.M. and 4:00 P.M. on April 21, Hester was kept in a room in the Audy Home infirmary which he described at his trial as a "dungeon room". The defendant did admit, however, that the room contained a bed with a blanket and clean sheets that he laid upon; he further stated that he was given lunch but claimed he did not eat it. The Audy Home superintendent testified the room was 7 feet 9 inches by 12 feet 8 inches with a 12-foot ceiling, and contained a hospital bed with a 6-inch innerspring mattress, a hospital table and stool, a light fixture, radiator, 28-by-52-inch transom, and 42-by-52-inch barred window.

About 4:00 P.M. Hester was provided with clothes and brought into an interview room at the Audy Home where he was questioned for approximately five minutes by Officers Thomas and Perkins, and Sergeants William Keating and John Killackey. The room where this interview took place was estimated by Officer Perkins to be 15 feet square with a barred window. Sergeant Killackey testified that the four officers began by introducing themselves to Hester, and that the defendant sat next to a wall flanked by Perkins and Thomas while Sergeant Keating sat behind a desk which he (Killackey) was sitting on. Officer Perkins testified that none of the policemen was closer to the defendant than 4½ to 5 feet during this 5-minute period. When Hester denied complicity in the crime he was confronted with the results of the crime laboratory tests which he was told revealed human blood on his clothes, a hair from a Caucasian female and a lipstick smear on his coat, and certain filings from his pocket. The defendant alleges that in addition to this incriminating evidence he was told that

his fingerprints were found on the icebox which was in the bookroom. He further claimed that Sergeant Killackey called him a liar when he denied responsibility for the murder and warned him "something was going to happen". The defendant testified that Killackey drew close to him, stuck a pen in his face and spit at him. The allegations of threatening, spitting and telling Hester about his fingerprints being found on the icebox were denied at the trial by all four of the officers who were in the room.

At the end of the 5-minute interview Sergeants Killackey and Keating, both of whom are Caucasian, left Hester in the room with the Negro officers Perkins and Thomas. According to the defendant, Officer Thomas told him that the two white officers were going to knock his head through the wall if he didn't admit the crime, but that Thomas assured him, "We ain't going to let them knock your head through the wall." Hester testified that he was then promised that if he admitted the murder his mother would bring him some clothes and he would be allowed to go home. The defendant's version of a police "Mutt and Jeff routine" (see *Miranda* v. *Arizona*, 384 U.S. 436, 452, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 1616) was denied by the officers who testified that Hester was only encouraged "to tell us about it and get it off his chest." Thomas and Perkins testified that after the defendant was given this advice he made an oral admission that an "accident" had occurred which resulted in his stabbing Mrs. Keane. They stated that Hester told them he tripped over some books at the entrance to the bookroom, that this caused a knife which was attached by rubber bands to his wrist to come into his hand, and that he stabbed Mrs. Keane as he fell; that he became scared and stabbed Mrs. Keane several more times, and then proceeded to sexually assault her. In describing his sexual assault, the officers testified that Hester said that he laid on top of her and "squirted", then bent over her to see if her heart was beating, and after he could not hear

a heartbeat he locked the bookroom door with keys that he had found, dropped the keys "somewhere", and rejoined a classmate, Sherman Baker, with whom he then returned to Miss Webster's class. After defendant's oral confession to the officers, Perkins testified that he brought photographs of the murder scene into the room and Hester pointed out certain items in the picture which he had mentioned in his statement. The defendant's testimony on this point is directly contradictory to the explanation of the police officers. Hester testified that the photographs of the bookroom were shown to him before and not after he confessed the crime, that he concocted the confession after viewing the pictures of the murder scene, and that the police coached him in portraying the details of the crime.

At approximately 5:00 P.M. Hester was examined by medical personnel at the Audy Home. Following the examination he was taken to the office of the State's Attorney in the Family Court Building which adjoins the Audy Home; and about 6:30 P.M. in the presence of assistant State's Attorney Louis Garripo, a court reporter, and Sergeant Keating, Hester made a confession of the crime which was substantially identical to the statement he had given to Officers Perkins and Thomas. At 8:15 P.M. three typed copies of the confession were returned by the court reporter and Garripo read the statement aloud as Hester followed along by reading a copy with which he had been supplied. Hester testified that the statement was read too fast for him to follow, but the State's witnesses stated that the confession was read slowly with the defendant pointing out several mistakes in the transcript. The copy of the confession admitted into evidence does contain the defendant's initials on each page with his initials appearing at each correction, and his signature on the last page of the statement. The fact that the statement was read aloud to the defendant and initialed by him at several points supports the State's contention that Hester understood what he was signing.

We come now to the defendant's many and varied allegations of error. A primary contention to which defense counsel devoted the bulk of their oral argument is that Hester's constitutional rights were violated by the admission into evidence of a confession elicited by psychological coercion and threats of brutality from a 14-year-old boy of limited mentality who was kept *incommunicado* for over 12 hours before signing a written confession, who was not furnished legal counsel, who was not advised of his constitutional rights, and who, after repeated requests to see his mother was refused the right to see her or any other friend before and during his interrogations. In support of this proposition the defense cites United State Supreme Court cases beginning with *Brown* v. *Mississippi,* 297 U.S. 278, 80 L. Ed. 682, 56 S. Ct. 461, and culminating in *Miranda* v. *Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.

The constitutional test governing the admission of a confession by an accused is whether it has been made "freely, voluntarily and without compulsion or inducement of any sort," or whether the defendant's will was overborne at the time he confessed. (*Culombe* v. *Connecticut,* 367 U.S. 568, 6 L. Ed. 2d 1037, 81 S. Ct. 1860; *Reck* v. *Pate,* 367 U.S. 433, 6 L. Ed. 2d 948, 81 S. Ct. 1541; *Haynes* v. *Washington,* 373 U.S. 503, 513, 10 L. Ed. 2d 513, 83 S. Ct. 1336, 1343.) Compulsion may also include torture of the mind when the will of the suspect succumbs to fear. (*Watts* v. *Indiana,* 338 U.S. 49, 52, 93 L. Ed. 1801, 69 S. Ct. 1347, 1349; *People* v. *Price,* 24 Ill.2d 46, 54.) "Determinative factors include not only illegal detention but its duration, the relentlessness of interrogation, disregard of the rudimentary necessities of life, the deprivation of counsel, deception respecting the accused's constitutional rights, the accused's age, education, emotional characteristics, and experience in criminal matters." (*People* v. *Price,* 24 Ill.2d 46, 57.) Since Hester's pre-*Miranda* trial commenced in September, 1961, the standard controlling admission of the

defendant's confession is the totality of circumstances test and this requires us to now make an independent review of the factors bearing upon voluntariness of the confession. *Haynes* v. *Washington,* 373 U.S. 503, 513, 515, 10 L. Ed. 2d 513, 83 S. Ct. 1336, 1343, 1344; *Gallegos* v. *Colorado,* 370 U.S. 49, 52, 8 L. Ed. 2d 325, 82 S. Ct. 1209, 1212.

A careful review of the extensive record here has led us to the following conclusions: (a) Hester's assertions of physical abuse, threats of impending peril if he did not confess, inducements of leniency if he did confess and fabrications concerning the evidentiary findings of the crime laboratory were controverted by each and every police officer and agent of the State who had contact with the defendant in the 12½-hour period between Hester's arrest and the signing of his written confession. Portions of defendant's testimony as to police brutality appear implausible on their face. In denying the motion to suppress the confession, after a full hearing, the trial judge said, "It is just inconceivable that Officer Prunkle would step up to him in the hallway there and kick him practically the moment when he first saw him * * *." We note further that the truthfulness of Hester's charge that he was thus kicked was impugned when he stated on cross-examination that he had been kicked in the left leg, but was then shown a newspaper photograph of himself pointing out his right leg as the one that had been kicked. When confronted with this picture the defendant responded "I forgot". In the absence of any evidence whatsoever to corroborate the defendant's somewhat contradictory and implausible testimony, the trial court was free to believe the wholly consistent testimony of the many State witnesses. (b) The defendant was not informed of his constitutional rights, nor was he provided with counsel or other friend to act on his behalf during the relatively brief periods of police interrogation. We have uniformly held, however, that in pre-*Miranda* cases the failure to advise a defendant of his constitutional rights,

as well as the absence of an attorney and the unlawful detention of a suspect are only attendant circumstances to be considered in deciding whether a confession was made voluntarily. (*People* v. *Musil,* 37 Ill.2d 373, 377-8; *People* v. *Lyons,* 36 Ill.2d 336, 339; *People* v. *Heise,* 35 Ill.2d 214, 216; *People* v. *Novak,* 33 Ill.2d 343, 348; *People* v. *Richardson,* 32 Ill.2d 472, 475; *People* v. *Hartgraves,* 31 Ill.2d 375, 379; *People* v. *Price,* 24 Ill.2d 46, 56; *People* v. *Jackson,* 23 Ill.2d 274, 280.) (c) The defendant's allegation that he made several requests to see his mother which were refused was repeatedly denied by the police and agents of the State's Attorney's office with whom he had contact. We find it highly relevant in this regard that Officers Thomas and Perkins went to the home of defendant at approximately 2:45 P.M. on April 21, saw Hester's mother, and apparently told her that defendant was being held by the police, although testimony as to that conversation was largely excluded when objected to on separate occasions by both the State and defense counsel. Defendant's mother agreed the officers called at her home and further testified that she was notified at 2:30 P.M. by a classmate of Hester's that he was in police custody, but she did not attempt to locate her son until approximately 6:00 o'clock that evening; and while no reason appears in the record to explain why Mrs. Hester was unable to see defendant when she arrived at the Audy Home at 9:30 P.M., it is clear that she did see him there at 10:00 A.M. the following morning. (d) The defense places heavy reliance on the theory that the confession should not have been admitted into evidence because it was elicited from a 14-year-old boy of subnormal intelligence. Mentality and scholastic achievement-test scores of defendant were admitted into evidence indicating Hester's abilities between November 26, 1958, when he was 11 years, 7 months old, and January 20, 1959. In the November tests Hester's mental age was estimated at 8 years, 8 months, and his IQ was 75. Since defendant was in grade 3-A at

the time he was being tested, his reading and arithmetic test scores should have registered at 3.5 to qualify as normal. On the California Achievement Test Hester scored a reading total of 2.0 and a math total of 3.5. The January, 1959, tests registered a mental age of 9 years, 9 months, with an IQ score of 82, which the psychologist testifying for the defense classified as an indication of "a slower than average rate of mental growth." At the time Mrs. Keane was murdered, the defendant was 14 years old; so that based on his lowest test scores and assuming his mental age and academic achievement in English skills continued to lag behind his chronological age at the same rate, defendant's mental age and abilities would have been at least equal to those of a normal 11-year-old child at the time he confessed to the crime. The general rule is that subnormal mentality does not *ipso facto* make a confession involuntary "so long as the subnormality has not deprived the person in question of the capacity to understand the meaning and effect of the confession. But mental subnormality is a factor to be considered in determining the issues of voluntariness and admissibility, and, where accompanied by other factors indicative of an absence of voluntariness, will require that the confession be excluded." (Annot., 69 A.L.R. 2d 348, 350; see *State* v. *Ordog,* 45 N.J. 347, 212 A.2d 370, 377; *People* v. *Lara,* 62 Cal. Rptr. 586, 601.) In *People* v. *Isby,* 30 Cal.2d 879, 186 P.2d 405, the court held admissible a murder confession by a 26-year-old defendant who was near the imbecile classification possessing an IQ of 58 and a mental age of 8 years, 8 months. The court there noted that the defendant did not "dispute the fact that he knew 'the difference between right and wrong', nor [did] he make any claim of insanity * * *. It was for the trial court to determine the competency of defendant in the light of his ability to 'perceive, and, perceiving, * * * make known [his] perceptions to others' [citation] and his capacity for 'receiving just impressions of the facts * * *

or * * * relating them truly' [citation]; and its ruling in favor of defendant Isby's qualification appears from the record to be well within the limits of judicial discretion. [Citing cases.] The weight and effect to be given his statements by reason of his asserted mental deficiency was then properly left to the jury." 186 P.2d at 416.

In a more recent case the Supreme Court of California decided that the murder confession of a 17-year-old defendant with a mental age of 10 years, 2 months, and an IQ of 65 to 71 was properly admitted. (*People* v. *Lara,* 62 Cal. Rptr. 586.) The *Lara* decision concludes that "a minor, even of subnormal mentality, does not lack the capacity as a matter of law to make a voluntary confession without the presence or consent of counsel or other responsible adult * * * the issue is one of fact, to be decided on the 'totality of the circumstances' of each case." (62 Cal. Rptr. at 603.) A similar holding appears in *State* v. *Watson,* 114 Vt. 543, 49 A.2d 174, where the admission into evidence of a confession of a 20-year-old defendant with a mental age between 8 and 9 years was upheld, the court reasoning that "the mere fact that a person is an infant and of low mentality does not render his confession inadmissible as being involuntary, providing he has the mental capacity to commit the crime with which he is charged. The reason for this rule being that if a child has such mental capacity as to render him amenable to the law for the commission of a crime he has sufficient mental capacity to make a confession of guilt." 49 A.2d at 178.

Similar determinations sustaining the admission into evidence of confessions of minors possessing subnormal intelligence appear in *State* v. *Ordog,* 45 N.J. 347, 212 A.2d 370, where one defendant charged with murder had a chronological age of 19 years but the intelligence of a 7-year-old and the judgment of a 6-year-old according to expert opinion, and another 17½-year-old defendant possessed borderline intelligence, was diagnosed as a chronic undif-

ferentiated schizophrenic, and committed to a State mental hospital after committing the murder but before he became a suspect. The admissibility of confessions by minors of subnormal mentality has also been upheld when elicited from a 15-year-old whose IQ was established to be between 61 and 80 (*Bean* v. *State*, 234 Md. 432, 199 A.2d 773); where a murder confession was given by a defendant with a chronological age of 15 years but who could not read or write and whose mental age was the equivalent of a 12-year-old (*Michaud* v. *State*, 161 Me. 517, 215 A.2d 87); where a 14-year-old Negro defendant with a mental age of 11 years and 4 months and an IQ of 79 confessed to the crime of rape (*Johnson* v. *Commonwealth*, 184 Va. 466, 35 S.E.2d 770); and where a defendant under the age of 16 confessed to a murder which he committed 2 days after his escape from a State hospital for the insane. (*State* v. *Ortega*, 77 N.M. 7; 419 P.2d 219.) In our own State we have held admissible the confession of a 19-year-old of below normal intelligence who was a confirmed narcotics addict (*People* v. *Townsend*, 11 Ill.2d 30, *cert.* den. 355 U.S. 850, 2 L. Ed. 2d 60, 78 S. Ct. 76), and we have decided that the youthful age of 14, while an important factor bearing on voluntariness, does not alone render a defendant's murder confession inadmissible. (*People* v. *Connolly*, 33 Ill.2d 128.) We conclude from the above cases that Lee Arthur Hester's confession was not inadmissible merely because of his youth and below normal mental faculties, and, in the absence of a showing of a coercive atmosphere that would produce an involuntary confession from his defendant we find that Hester's confession was properly admitted.

In alleging that such a coercive atmosphere did in fact exist defendant relies on such United States Supreme Court cases as *Haley* v. *Ohio*, 332 U.S. 596, 92 L. Ed. 224, 68 S. Ct. 302; *Gallegos* v. *Colorado*, 370 U.S. 49, 8 L. Ed. 2d 325, 82 S. Ct. 1209, and *Reck* v. *Pate*, 367 U.S. 433,

6 L. Ed. 2d 948, 81 S. Ct. 1541, all of which held that confessions secured from minors through police interrogation were improperly admitted, but we do not believe that those decisions control the outcome of this case. Those factual situations contained certain common elements which amounted to "a totality of coercive circumstances" not here involved. (See *Reck* v. *Pate,* 367 U.S. 433, 443, 6 L. Ed. 2d 948, 81 S. Ct. 1541, 1547.) In *Haley* the murder confession of a 15-year-old boy was obtained after 5 or 6 hours of police questioning in relays through the dead of night until approximately 5:00 A.M. when he confessed after being shown alleged statements of two confederates incriminating him. The defendant was then placed in jail and held *incommunicado* for over three days during which time a lawyer retained by his mother was twice refused access to him, and his mother was not allowed to see him until more than five days after his confession, although a newspaper photographer had been admitted to take defendant's picture immediately after he confessed. While it is true that the court in *Haley* notes that a lad of 15 cannot be judged by the more exacting standards of maturity and needs counsel and support if he is not to become the victim of fear and panic, we believe that the reference to the need of such a defendant for "someone on whom to lean lest the overpowering presence of the law, as he knows it, crush him" (332 U.S. at 600, 92 L. Ed. at 228, 68 S. Ct. at 304), must be read in the context of the brand of police interrogation there dealt with. And we find the *ratio decidendi* of *Haley* in the following passage: "The age of petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, the callous attitude of the police towards his rights *combine* to convince us that this was a confession wrung from a child by means which the law should not sanction. Neither man nor child can be allowed to stand condemned by methods which flout constitutional requirements of due process of law." 332

U.S. at 600-601, 92 L. Ed. at 229, 68 S. Ct. at 304. (Emphasis added.)

Turning to *Reck* v. *Pate,* 367 U.S. 433, 6 L. Ed. 2d 948, 81 S. Ct. 1541, we find a concise summary of the salient facts followed by a holding that is clearly framed in terms of the totality-of-circumstances principle:

"At the time of his arrest Reck was a nineteen-year-old youth of subnormal intelligence. He had no prior criminal record or experience with the police. He was held nearly eight days without a judicial hearing. Four of those days preceded his first confession. During that period Reck was subjected each day to six- or seven-hour stretches of relentless and incessant interrogation. The questioning was conducted by groups of officers. For the first three days the interrogation ranged over a wide variety of crimes. On the night of the third day of his detention the interrogation turned to the crime for which petitioner stands convicted. During this same four-day period he was shuttled back and forth between police stations and interrogation rooms. In addition, Reck was intermittently placed on public exhibition in 'show-ups.' On the night before his confession, petitioner became ill while on display in such a 'show-up.' He was taken to the hospital, returned to the police station and put back on public display. When he again became ill he was removed from the 'show-up,' but interrogation in the windowless 'handball court' continued relentlessly until he grew faint and vomited blood on the floor. Once more he was taken to the hospital, where he spent the night under the influence of drugs. The next morning he was removed from the hospital in a wheel chair, and intensive interrogation was immediately resumed. Some eight hours later Reck signed his first confession. The next afternoon he signed a second.

"During the entire period preceding his confessions Reck was without adequate food, without counsel, and without the assistance of family or friends. He was, for all

practical purposes, held incommunicado. He was physically weakened and in intense pain. We conclude that this total combination of circumstances 'is so inherently coercive that its very existence is irreconcilable with the possession of mental freedom by a lone suspect against whom its full coercive force is brought to bear.'" 367 U.S. at 441-2, 6 L. Ed. 2d at 953, 81 S. Ct. at 1546-7.

In *Gallegos* the 14-year-old defendant was apprehended by police and immediately confessed to having assaulted and robbed an elderly man who was then hospitalized due to the defendant's beating but who later died as a result thereof. Gallegos was picked up by police on January 1, 1959, when he orally confessed the assault and robbery to the arresting officer. On January 2, the defendant's mother was refused permission to see him at the Juvenile Hall where he was being kept in security. The defendant made a confession to police again on January 2, and signed a full and formal confession on January 7. After a trial in juvenile court on January 16, the defendant was committed to the State Industrial School on the assault charge, but thereafter the robbery victim died and Gallegos was tried criminally, convicted and sentenced to life imprisonment. In reversing the conviction the court notes that while there was no evidence of prolonged questioning, "the five-day detention—during which time the boy's mother unsuccessfully tried to see him and he was cut off from contact with any lawyer or adult advisor—gives this case an ominous cast." (370 U.S. at 54, 8 L. Ed. 2d at 328, 82 S. Ct. at 1212.) The *Gallegos* majority found that the "crucial evidence" introduced at the defendant's murder trial was his formal signed confession, executed after secret inquisitorial processes extending from January 1 to 7, during which time the defendant saw no lawyer, parent or other friendly adult, and the reversal of the murder conviction was predicated on a theory wholly consistent with the prior *Haley* and *Reck* decisions.

Lee Arthur Hester was not held *incommunicado* by the police for over five days (*Haley, Reck* and *Gallegos*), he was not questioned unrelentingly (*Haley* and *Reck*), nor questioned through the dead of night (*Haley*), and he was not reduced to vomiting blood on the floor during interrogation (*Reck*). He was questioned for approximately 45 minutes in the morning and then left virtually alone, though in police custody, from 8:45 A.M. until 4:00 P.M. There is no shred of evidence, besides the defendant's sometimes implausible testimony, that he was treated otherwise than humanely by the law enforcement officials. When Hester was questioned again at 4:00 o'clock it took just over 5 minutes for him to confess the crime, and the officers spent the remainder of the hour listening to the details and confirming the fact that the defendant's description correlated with the physical layout of the murder scene. The hours between 5:00 and 8:15 P.M. were filled with the administrative details of administering a medical examination to the defendant, procuring an assistant State's Attorney and court reporter, recording the defendant's confession, transcribing it into typed copies, rereading it to the defendant, making necessary corrections, and having the defendant initial and sign it. By 10:00 A.M. the next morning the defendant was allowed to see his mother. It is firmly established that this court will not reverse a trial-court determination on the voluntary character of a confession unless it is against the manifest weight of the evidence or amounts to an abuse of discretion (*People* v. *Hall,* 38 Ill.2d 308; *People* v. *Cocroft,* 37 Ill.2d 19, 23; *People* v. *Hartgraves,* 31 Ill.2d 375; *People* v. *DiGerlando,* 30 Ill.2d 544; *People* v. *Spencer,* 27 Ill.2d 320, 325-6; *People* v. *Goard,* 11 Ill.2d 495, 499; *People* v. *McFarland,* 386 Ill. 122, 130), and we cannot say upon this state of facts that the defendant's confession was coerced.

The defendant next advances the contention that the criminal court of Cook County was without jurisdiction to

try him (citing Ill. Rev. Stat. 1959, chap. 23, par. 2001, 2012, 2014 and 2021), and that his confession was inadmissible in the criminal action against him because it was made to officers of the family court. (See Ill. Rev. Stat. 1959, chap. 23, par. 2001; *Harling* v. *United States* (D.C. cir.), 295 F.2d 161.) On April 22, the day after Hester's confession, a delinquency petition was filed against him predicated upon his criminal act. This petition was never acted upon, and the defendant now urges us to read statutory sections 9a and 10 of the old Family Court Act (pars. 2014, and 2021) *in pari materia* to require that the family court first exercise its discretion in determining whether to "permit" the criminal court to entertain a criminal action against a juvenile defendant who has a delinquency petition pending against him for the same act. While we have never considered this precise question (see *People ex rel. Malec* v. *Lewis,* 362 Ill. 229, 231; 1962 Ill. L. F. 533, 539-40, n. 41), we believe that the reasons stated in *People* v. *Lattimore,* 362 Ill. 206, apply with equal force here. In *Lattimore* (pp. 208-9) we noted that the juvenile court was one of limited jurisdiction while the jurisdiction of the criminal court to try cases was vested by section 26 of article VI of the State constitution, and we concluded: "The legislature is without authority to confer upon an inferior court the power to stay a court created by the constitution from proceeding with the trial of a cause jurisdiction of which is expressly granted to it by the constitution." As we will always adopt a reasonable construction of a statutory provision which renders it constitutional, we read the language of section 9a that "The [juvenile] court may in its discretion in any case of a delinquent child permit such child to be proceeded against in accordance with the laws that may be in force in this State governing the commission of crimes * * *. In such case the petition filed under this act shall be dismissed" as permitting the juvenile court to dismiss a delinquency action which is brought contemporaneously with

an action in the criminal court for the same acts of the minor. Thus section 9a merely allowed the juvenile court to prevent a concurrent action from proceeding before it, and did not provide an avenue whereby the juvenile court could prevent a criminal action against a minor defendant.

We do not agree with defendant's view that his confession was inadmissible in his criminal prosecution because of section 1 of the old Family Court Act (now chap. 37, par. 702—9), which makes a minor's confession inadmissible in a criminal proceeding if it was made to the juvenile court "or any officer thereof". It cannot logically be contended that officers of the Chicago Police Department and assistant State's Attorneys, who are charged with the responsibilities of apprehending and prosecuting criminals, are officers of the juvenile court within the meaning of that statutory section which, in our judgment, clearly was intended to embrace juvenile probation officers and their assistants. The use of the facilities of a juvenile detention home to house and question a minor suspected of perpetrating a crime seems far superior to thrusting the youth into an atmosphere where hardened adult criminals are jailed, but such use of the juvenile facilities does not automatically transform State's Attorneys and policemen into officers of the juvenile court. Moreover, the rule adopted in *Harling* v. *United States* (D.C. cir.), 295 F.2d 161, which prevents the admission of juveniles' confessions that are obtained before waiver of jurisdiction by the juvenile court is inapplicable because, as we have just noted, it was not necessary for our juvenile court to waive jurisdiction before the criminal courts could validly proceed. The rationale of *Harling* has also been questioned and rejected by certain sister States (*State* v. *Gullings,* 244 Ore. 173, 416 P.2d 311; *People* v. *Lara,* 62 Cal. Rptr. 586) because the *parens patriae* relationship cannot be said to exist between the police and the child, but only between the minor and the court. We therefore hold that the criminal court

of Cook County had jurisdiction over the defendant and properly admitted the confession which he gave to police officers.

The defendant next argues that it was reversible error to restrict the testimony of a psychiatrist who, if permitted, would have testified that Hester harbored an abnormal fear of physical injury, and was terrified of large and older males due to his familial relationship with his father and older brothers, and that this made him "extremely susceptible to very moderate pressure from male authority figures." Another offer of proof added that in view of these circumstances the psychiatrist would testify that the possibility of a dictated confession could not be ruled out, but rather had a high degree of probability. The defense psychiatrist, Dr. Marvin Ziporyn, conducted two examinations of the defendant while Hester was awaiting the commencement of his murder trial. The trial court permitted the first examination because defense counsel stated that they wanted to have blood extracted from the defendant, and when the State asked permission to be present defense counsel retorted "Our word must mean something to the court." Dr. Ziporyn was allowed to see Hester in private at which time he administered a truth drug to the defendant rather than taking a blood sample, and defense counsel were censured by the court for use of this tactic. At the trial the judge refused to permit Dr. Ziporyn to give his opinion of the defendant's susceptibility to a dictated confession which would have been based on a complete case history given by Hester to the psychiatrist during their second interview. The reason for the court's refusal to allow Ziporyn's opinion on Hester's suggestibility was that the psychiatrist was not a "treating" physician but rather an examining doctor secured solely for the purpose of giving testimony on the defendant's behalf at the forthcoming trial. The facts substantially support the court's conclusion as to the purpose for which Dr. Ziporyn's aid was enlisted, and in the circum-

stances of this case it was not an abuse of discretion to limit the psychiatrist's testimony to hypothetical questions drawn from facts admitted into evidence. It is our rule that a doctor who examines a patient merely for the purpose of qualifying as a witness ordinarily may not testify as to his medical opinions based upon subjective symptoms described by the patient because of the absence from this relationship of the normal truthworthiness accompanying symptomatic descriptions by a patient to a treating physician. (*Jensen* v. *Elgin, Joliet and Eastern Railway Co.*, 24 Ill.2d 383, 389; *Bowman* v. *Illinois Central Railroad Co.*, 11 Ill.2d 186, 214.) Where doubt is cast upon the truthworthiness of the patient's statements by the circumstances of the physician-patient consultation the trial court should be given considerable discretion in the rejection or reception of such evidence. (*Gonzales* v. *Hodsdon* (Idaho), 420 P.2d 813, 816 and cases cited therein.) The evidentiary rule which limits the medical testimony of a nontreating physician to hypothetical questions has been held to apply with equal force to a psychiatrist's testimony pertaining to a patient's alleged emotional infirmity because "most courts refuse to permit the physician to act as the patient's conduit for narrative declarations." (*Gonzales*, 420 P.2d at 816.) Since the defense offered no evidence to show a family history that would have caused Hester to harbor an abnormal fear of older males, there was no basis upon which proper hypothetical questions could have been propounded to Dr. Ziporyn. Moreover, we have upheld the refusal of an offer of psychiatric proof which was made with the intent of showing that a defendant was especially likely to issue a false confession in order to escape the coercive pressures applied by his interrogators where, as here, 'there was no evidence of coercive pressure or unreasonable interrogation and thus no basis or need for a weighing against powers of resistance." (*People* v. *Miller*, 13 Ill.2d 84, 103; see, also, *Miller* v. *Pate* (7th cir.), 300 F.2d 414.) In *Miller* we

added that our decision sustaining the refusal of such an offer of psychiatric proof was fortified by evidence in the record showing that the defendant was not a personality type that would be readily susceptible to coercive pressures. We note similarly that Hester's school records for the five most recent semesters reveal that his attitude toward authority was rated as "openly defiant".

Many of the remaining allegations of error are susceptible of summary disposition either because they are substantially lacking in merit or are supported only by legal positions which are not the law in this State. Those most easily dismissed are (1) that there were material discrepancies between Hester's confession and that which the physical evidence suggests actually happened; (2) that the trial court should have permitted the testimony of a graphoanalyst as to the victim's state of mind when she was writing a note immediately prior to being attacked; (3) that the judge should have allowed the defense motion that the jury be taken to personally view the scene of the crime and related premises; (4) that the numerous interjections and objections by counsel for the prosecution were calculated to prevent a fair trial and to distract the jury; (5) that the trial judge repeatedly and unnecessarily interrupted defense counsel, restricted their direct and cross-examination, rebuked them before the jury and indicated irritation with defense counsel, thereby prejudicing defendant's right to be effectively represented; (6) that the judge should not have limited the closing argument of each side to two hours; and (7) that the age of the defendant was not properly proved. As to these we find: (1) Any discrepancy between Hester's confession and the physical evidence was for the jury to consider in assessing the degree of credibility to accord the confession. We do not believe, for instance, that the trial court should have withdrawn the confession from the jury's consideration merely because the defendant confessed to having attacked the victim from a different angle or stabbed

her less than the number of times which the expert testimony indicates actually occurred. Hester's confession that he experienced an orgasm while lying on top of Mrs. Keane may be viewed as an attempt to minimize his culpability just as the "accident" segment of his confession apparently attempted to do, and we do not regard Hester's attempts at partial exculpation as a sufficient variance from the truth to warrant exclusion of his confession. (2, 3) The defense attempted to show that the deceased was engaged in writing a note when she was apparently frightened by her attacker. The effort to prove the existence of such a state of facts was made to indicate an inconsistency with Hester's statements to police that Mrs. Keane was tearing open a package when he entered the room. The method by which defense counsel attempted to prove the victim's state of mind as she wrote the last two words of the unfinished note was by offering the testimony of a handwritting expert (a probation officer) who stated that "being in fear and being startled can *possibly* be determined by the examination of a particular piece of handwriting." (Emphasis added.) We believe that the trial court's refusal to allow this witness to give an opinion on the victim's emotional state of mind was well within the court's discretionary powers to exclude proferred testimony which is speculative and therefore incompetent. We find that the court's refusal to permit the jury to be taken to view the Lewis-Champlin School was also within the sound discretion of the judge, especially in view of the several witnesses who described the premises and the number of pictures thereof which were in evidence. (4, 5) The many objections made by the prosecution to defense counsel's examination of witnesses were frequently necessitated by improper questions posed by defense counsel who persisted in pursuing lines of questioning to which the court had already sustained objection. Such criticism as the court made of this conduct was justified by the court's responsibility to maintain order and com-

mand respect for his rulings. (*Chicago City Railway Co.* v. *Shaw,* 220 Ill. 532, 537; see, also, *People* v. *Westrup,* 372 Ill. 517, *cert.* den. 310 U.S. 642, 84 L. Ed. 1410, 60 S. Ct. 1089; *Spears* v. *People,* 220 Ill. 72.) (6) No objection appears in the record to the court's limitation of final argument to 2 hours for each side although defense counsel claim that such objection was vigorously argued outside the presence of the jury. We, however, must be guided by the record and where it does not affirmatively appear that such objection was raised we cannot hold the 2-hour limitation here amounted to an abuse of discretion. (*Capriola* v. *United States* (7th cir.), 61 F.2d 5, 11; 6 A.L.R.3d 604, 627-30 and cases cited therein.) (7) That the defendant's age was sufficiently proved cannot be questioned in this case where Hester's school records which were introduced by the defense referred to the defendant's birth date and age in several places; nor was it error to submit to the jury forms of verdicts in which defendant's age was stated, since his age was not disputed.

We believe that at the time they placed the defendant under arrest Detectives Prunkle and Teller had sufficient grounds to form a reasonable belief that Hester had committed the murder of Mrs. Keane. (See Ill. Rev. Stat. 1961, chap. 38, par. 657.) When the officers took the defendant into custody they knew that one teacher at the school had seen the defendant alone in the hall on the morning of the crime, and both this teacher and a school clerk told the officers that they had heard that Hester was accused of sexual misconduct with another student and that Mrs. Keane was handling the matter. The clerk, Mrs. Considine, informed the detectives that she had learned about the matter directly from Mrs. Keane. When the officers interviewed Hester they saw bloodstains on his clothing for which, according to the police, he gave four separate explanations. We have said that "reasonable cause" to make an arrest without first obtaining a warrant means some-

thing less than evidence which would result in a conviction (*People* v. *Jones*, 38 Ill.2d 427, 431), and the absence of a warrant may justifiably be made to depend upon "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act." (*Brinegar* v. *United States*, 338 U.S. 160, 175, 93 L. Ed. 1879, 69 S. Ct. 1302; *People* v. *Pitts*, 26 Ill.2d 395, 399.) Based on the information acquired by Teller and Prunkle, they acted reasonably when they placed Hester under arrest. They had a right to rely upon the partly hearsay information which they received from Miss Fritsch and Mrs. Considine (*Draper* v. *United States*, 358 U.S. 307, 311-12, 3 L. Ed. 2d 327, 79 S. Ct. 329, 332), and the usual requirement of prior reliability which must be met when police act upon "tips" from professional informers does not apply to information supplied by ordinary citizens. (*Draper;* *People* v. *Lewis*, 49 Cal. Rptr. 579, 582; George, Constitutional Limits on Evidence in Criminal Cases, 13.) Having found that Hester's arrest was lawful we find nothing impermissible in the seizure of his clothing for crime laboratory analysis. The former distinction which prohibited the warrantless seizure of items of merely evidential value and permitted the seizure of those items that are instrumentalities or fruits of a crime, or which constitute contraband or weapons by which escape might be effected has been discarded and, in conjunction with a valid arrest, the government may now seize "mere evidence" for the purpose of proving a crime. (*Warden* v. *Hayden*, 387 U.S. 294, 18 L. Ed. 2d 782, 87 S. Ct. 1642, 1649.) Our holding that Hester's clothing was properly seized regardless of the lack of a search warrant is consonant with similar decisions in other jurisdictions where the removal of a suspect's clothes for scientific examination has been upheld because of the intimate connection between such evidence and the crime for which the person was arrested. *Golliher* v. *United States* (8th cir.), 362 F.2d 594, 601; *State* v. *Dill*, ——

Minn. ——, 151 N.W.2d 413; see, also, *People* v. *Rossolille*, 38 Ill.2d 316; *People* v. *Brown*, 38 Ill.2d 353; *People* v. *Jones*, 38 Ill.2d 427.

The defense argues that it was error for the trial judge to submit only the question of the credibility of the defendant's confession to the jury and to withhold for his own determination the question of the voluntariness of the confession which he ruled upon after a preliminary hearing on a motion to suppress. The court's actions in following this procedure were wholly in accord with accepted practice in this State. (*People* v. *De Simone*, 27 Ill.2d 406; *People* v. *Stacey*, 25 Ill.2d 258.) The defendant was permitted to re-present before the jury all of the evidence presented to the judge on the motion to suppress, together with additional evidence bearing on the credibility of the confession for consideration by the jury in its ultimate determination of the weight to be given the confession. The decision in *Jackson* v. *Denno*, 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774, establishes no Federal constitutional compulsion that the voluntariness of a confession, as such, be retried by a jury. (*People* v. *Hutson* (Cal. App.), 60 Cal. Rptr. 33, 38.) We find also that the defendant was accorded his full discovery rights under the controlling rules of *People* v. *Wolff*, 19 Ill.2d 318, and *People* v. *Moses*, 11 Ill.2d 84. Defense counsel complain because they were not provided with the notations jotted down by the crime laboratory technicians when they performed scientific tests on the evidence procured during the police investigation of the murder. There is no intimation, however, that these notations were contradictory to the testimony of the laboratory technicians concerning their findings so that the defendant cannot claim the benefit of *People* v. *Moses*, 11 Ill.2d 84, 89, and such numerical notations cannot correctly be characterized under the Jencks Rule (18 U.S.C. 3500) that we adopted in *Wolff* as a "written statement" which has been defined as "a recorded recital of past occurrences

made by a prospective prosecution witness." (*United States v. Sopher* (7th cir.) 362 F.2d 523, 525.) Furthermore, the defendant fails to show that he was restricted in any material aspect of discovery. He was provided with prior statements of all State witnesses, copies of his written confession and the complete records of the board of education concerning him, copies of the autopsy and crime laboratory test results, as well as the opportunity on two occasions for his own experts to perform independent experiments on the physical evidence at the police laboratory, although the results of these tests were never offered at the trial. Instead defense counsel chose to conduct a painstaking cross-examination on the methods of analysis used by a police technician to type the dried blood found on Hester's clothing, and the defense then introduced the testimony of a serologist that the methodology followed and results obtained in the State's tests were "inconclusive." Considering that the defendant was allowed a wide range for discovery and impeachment purposes, and that he was provided with copies of reports of the test results, we find that he was not deprived of any right because he failed to receive notes apparently consisting of mere numerical jottings made by police technicians during their experiments, and these notations do not, in any event, qualify as "statements" within the intent of our rule.

The defendant may not now complain of the impropriety of the prosecution's closing arguments to which he failed to object in court. (*People v. Donald,* 29 Ill.2d 283, 287; *People v. Winters,* 29 Ill.2d 74, 80; *People v. Sinclair,* 27 Ill.2d 505, 509.) Nor do we find any error in the State's eliciting testimony as to the defendant's blood type from a doctor retained by the defense for the purpose of typing Hester's blood. The statute (Ill. Rev. Stat. 1961, chap. 51, par. 5.1) relied upon by the defendant protects information acquired through a physician-patient relationship while the

doctor is "attending" the patient in a professional capacity, and although we express no opinion whether the limited purpose for which the physician saw Hester constitutes sufficient medical treatment to invoke the statutory protection, we do hold the privilege inapplicable here under the statutory exception which allows a disclosure relating directly to the fact or immediate circumstances of a homicide.

In answer to the defendant's final point we find that the State's evidence does in fact support the jury verdict of guilty. The scientific evidence presented by it, aside from the testimony regarding blood identification, was impressive and without substantial contradiction. Certain metal particles found in the defendant's pockets were scientifically proved to have exactly the same refractive index and solubility as the metal particle found in the waistband of the victim's panties. The laboratory findings regarding these particles led the State's expert to conclude that they were all from the same source which contained a silver base covered by a protective plastic coating, such composition indicating jewelry. The defense argument that there was no way such a particle from the defendant's pocket could have come to be imbedded in the back of the deceased's waistband is exceedingly questionable in a case involving a forcible rape, particularly since defendant's statement indicates the decedent "rolled over". The lipstick stain on the defendant's jacket was found by ultra-violet inspection to be similar in color, reflection and fluorescence to that found in Mrs. Keane's purse, and when a gray hair from the victim's head was compared to the hair found on Hester's jacket both were determined to be Caucasian in origin, devoid of pigment, containing the same density, refractive indices, and medullary structure. In view of the State's expert testimony that it was very, very remote that these hairs could have different origins, there is little force to the defense argument that the hair on the defendant's

jacket could have come from "anywhere." In our opinion the evidence, when viewed as a whole, provides an ample basis for the jury verdict.

The judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*

Mr. JUSTICE WARD took no part in the consideration or decision of this case.

Mr. JUSTICE SCHAEFER, dissenting:

This 14-year-old defendant, whose mental age the majority assumes to be that of a normal 11-year-old, was convicted of murder largely on the basis of his written confession. He signed that confession about 12½ hours after he had been arrested. During the intervening period he was held incommunicado in the custody of the police. He was questioned by four officers. It is conceded that he was not told that he was under arrest, that he had the right to counsel, that he was not required to answer any questions or that anything that he said could be used against him in a criminal case.

Concerning the defendant's requests to see his mother the opinion of the majority states: "We find it highly relevant in this regard that Officers Thomas and Perkins went to the home of defendant at approximately 2:45 P.M. on April 21, saw Hester's mother, and apparently told her that defendant was being held by the police, although testimony as to that conversation was largely excluded when objected to on separate occasions by both the State and defense counsel. Defendant's mother agreed the officers called at the home and further testified that she was notified at 2:30 P.M. by a classmate of Hester's that he was in police custody, but she did not attempt to locate her son until aproximately 6:00 o'clock that evening; and while no reason appears in the record to explain why Mrs. Hester was unable to see defendant when she arrived at the Audy

Home at 9:30 P.M., it is clear the she did see him there at 10:00 A.M. the following morning."

The majority finds it "highly relevant" that the defendant's mother was "apparently told" by the officers who went to the defendant's home that the defendant was being held by the police. What the record shows, however, is that the assistant State's attorneys persistently objected to questions about what the officers had told the defendant's mother when they spoke to her at her home on the afternoon of April 21. Testimony as to that conversation was totally excluded, and always upon the objection of the State. The defendant's attorney objected once to a related question, but his objection was overruled. This is what occurred on the re-direct examination of Officer Thomas by Assistant State's Attorney Stamos:

"Q. Officer Thomas, did you go by the home of the defendant on April 21st, 1961, at approximately three-thirty or four o'clock, write out on a piece of paper, a note for his mother?

A. Around a quarter to three, I did.

Mr. Feldman: I think I will have to object. Doesn't this exceed the scope of the cross-examination?

The court: Well, it seems to me you are making an inquiry.

Mr. Feldman: You would not let me go any further.

Mr. Stamos: I would like to know the reason, whether the parents were notified or not, and that is our purpose in bringing this out.

The court: That is perfectly proper in view of the question of Mr. Feldman. Did you stop at the home of the defendant at that hour?

The witness: Yes, sir. And I got—

The court: Did you see the mother of the defendant?

The witness: Yes, sir.

The court: Was she there at the time?

The witness: Yes, sir. We notified her to be—

Mr. Stamos: He can't tell us this. You can't tell us what you said.

The court: You can't tell us what you said to her, but you saw her and you talked to her, did you?

The witness: Yes, sir.

The court: All right."

When the defendant's mother was asked by his attorney "At any time on April 21st, 1961, did any police officer or school teacher inform you as to the whereabouts of your son, Lee Arthur Hester?", both assistant State's attorneys objected and the objection was sustained. Their objections to questions about her visit to her son's school on that afternoon and about her trip to the neighborhood police station were similarly sustained.

The grounds upon which the prosecution's objections and the court's rulings were based does not appear in the record, and the majority opinion does not attempt to justify them. I can find no support in the record for the statement in the majority opinion that the defendant's mother "did not attempt to locate her son until approximately 6:00 o'clock that evening." What the record shows is that the prosecution consistently and successfully resisted every attempt to find out whether the police officers told the defendant's mother where he was, and what efforts she made to see him. The defendant's mother testified that she first learned where her son was at 6:00 o'clock that evening, but the prosecutor's objection to the next question, "Who furnished you with this information?" was sustained.

The burden was upon the prosecution to establish the voluntariness of the confession by a preponderance of the evidence. (*People* v. *Harper*, 36 Ill.2d 398, 402; *People* v. *McGuire*, 35 Ill.2d 219; *People* v. *Thomlison*, 400 Ill. 555, 561.) In my opinion the prosecution failed to meet that burden, and the admission of the defendant's confession violated his constitutional rights.